[S.F. No. 24698. July 29, 1985.]

TERRY VAL YARBROUGH, Petitioner, v.
THE SUPERIOR COURT OF NAPA COUNTY, Respondent;
COUNTY OF NAPA, Real Party in Interest.

**COUNSEL**

Wagner, Henderson, Davis & Robertson and J. Roland Wagner for Petitioner.

Ephraim Margolin, Richard J. Wilson, Doron Weinberg, Nina Wilder, Gerald F. Uelmen, Gary M. Mandinach, Edward L. Lascher, Wendy Cole Lascher, Lascher & Lascher, Frank M. Woodhead, Charles A. Lynberg, Arthur E. Schwimmer, Richard H. Benes, William S. Dato, Peter Hans Klee, Siegfried Hesse, Cindy Alberts-Carson, Richard Gruner, Gerald Masahiro Sato, Lee D. Morhar, David J. Linden, Lawrence M. Gassner,

Irving F. Reichert, David M. Balabanian, Fred H. Altshuler, Michael Dufficy, Kenneth Drexler, Mark N. Aaronson, Judy R. Campos, Michael J. Brady, Gail Y. Norton, Ropers, Majeski, Kohn, Bentley & Wagner, Richard Alexander, Lynne Yates-Carter, Keogh, Marer & Flicker, Gerald Z. Marer, Herbert M. Rosenthal, Ellen P. Dreibelbis, Russell B. Longaway and Burke Critchfield, as Amici Curiae on behalf of Petitioner.

No appearance for Respondent.

Stephen W. Hackett, County Counsel, and R. Clifford Lober, Chief Deputy County Counsel, for Real Party in Interest.

Ronald A. Zumbrun, Mark A. Wasser, Douglas J. Maloney, County Counsel (Marin), John F. Govi, Deputy County Counsel, Beverly Jean Gassner, Gassner & Gassner, Kathleen J. Purcell, Remcho, Johansen & Purcell, Charles E. Dickerson III and Sanders & Dickerson as Amici Curiae on behalf of Real Party in Interest.

Robert F. Wilson, Wilson, Borror, Dunn & Scott, Richard Bawden, Reynolds, Reider & Bawden, Thomas F. Schroeter, Gary L. Frank, Susan Jackson Balliet, Eric W. Wright, Catherine Fancher Campbell and Elizabeth Benford as Amici Curiae.

---

OPINION

KAUS, J.—

INTRODUCTION

■ In 1976 we decided in *Payne* v. *Superior Court*, 17 Cal.3d 908 [132 Cal.Rptr. 405, 553 P.2d 565], that as a matter of due process and equal protection under both the federal and California Constitutions an indigent prisoner who is a defendant in "a bona fide legal action threatening his interests" is entitled to access to the courts to be heard in his defense. We left to the trial court's discretion how access is to be achieved in particular cases, recognizing that, at times, appointment of counsel may be the only alternative. We made it clear, however, that the trial court's authority to appoint counsel is independent of its power to order compensation.

■ We reaffirm *Payne:* In an appropriate case, and as a last alternative, appointment of counsel may be the only way to provide an incarcerated, indigent civil defendant with access to the courts for the protection of threat-

ened personal and property rights. We again stress that access—not the right to counsel—is the keystone of the structure we built in *Payne,* and we point out once more that the power to appoint is independent of the power to compensate.

This case illustrates, however, that there may be some misunderstanding as to the standards for the exercise of the trial court's authority to appoint counsel. Preliminarily, we note that the proceedings on motion for appointment of counsel are essentially ex parte. Absent a truly adversary hearing—the county here opposed only an order requiring compensation—the burden is on the trial court to recognize the unusual case where future property rights are genuinely at stake for the presently indigent incarcerated defendant. It falls on the trial court to recognize and adhere to the guidelines set out in *Payne.* We examine this case in that light.

## I. FACTS

Terry Val Yarbrough seeks a writ of mandate to compel respondent Superior Court of Napa County to appoint counsel to represent him in an action for wrongful death (Cantrell v. Brass Rail Bar et al. (Napa Super. Ct., No. 44340)) in which he is named a defendant.[1] Yarbrough is imprisoned at Folsom Prison, serving a term of 17 years to life for second degree murder. (People v. Yarbrough (A020826, app. pending).) His conviction resulted from the shooting death of Keith Cantrell outside the Brass Rail Bar in Napa. Cantrell's minor son filed a complaint on June 10, 1982, suing the bar, as well as its owner and bartender, and Yarbrough for wrongful death, seeking $1 million in both general and punitive damages.

Yarbrough was not served with the complaint and summons until April 20, 1983, some 10½ months after filing of the complaint. He moved for appointment of counsel;[2] Napa County contested the motion only insofar as the county might be required to compensate counsel.

In the motion for appointment of counsel, Yarbrough alleged that he was being sued and that he was incarcerated, indigent, and uneducated; that the civil litigation was "harassment" inasmuch as he was "totally indigent and unable to respond in damages or even retain an attorney"; that he would

---

[1]Respondent court, as such, has filed no response to the alternative writ. The County of Napa, as real party in interest, opposes the compensation of counsel. More than two dozen amicus briefs have been submitted by county and city bar associations, the State Bar, and other interested entities and organizations.

[2]Yarbrough asked for the appointment of J. Roland Wagner, the attorney who had represented him in the criminal action as a contract public defender. The attorney made a special appearance on the motion and continues to represent Yarbrough in these proceedings.

suffer a default judgment of $2 million, a result which could be avoided by appointment of counsel; and that if default were taken against him, a "significant issue of liability" would arise for the county and/or the state from the "state action" in refusing to appoint counsel. Yarbrough relied on *Payne, supra,* 17 Cal.3d 908, Government Code section 27706, subdivision (c)[3] and the federal Civil Rights Act, 42 United States Code section 1983.

In opposition, the county alleged that it was not required to compensate counsel for Yarbrough because the Legislature has not appropriated funds for the defense of prisoners who are defendants in civil cases; the court had no power to order compensation where no legislative authority exists; appointment of counsel for Yarbrough would not significantly affect the outcome of the civil suit and thus no fundamental interest of Yarbrough would be jeopardized; the state was a necessary party to the motion; Government Code section 27706 applied only to the office of public defender, not to a contract public defender; and the legal needs of Yarbrough could possibly be met by the fund set up in section 6210 et seq. of the Business and Professions Code.

The trial court started the hearing on the motion by pronouncing Yarbrough's right to counsel: "Lord knows the man ought to have a lawyer." The thrust of the proceedings was who would be appointed—inquiry of the legal aid services and the state public defender had proved futile—and whether the attorney could be compensated. Yarbrough's principal contention was that the contract public defender should continue to represent him in the civil suit. He relied on section 27706, subdivision (c), of the Government Code. The court found the section inapplicable.

The court took judicial notice of Yarbrough's incarceration and of his 1981 financial declaration of indigency, made before the criminal trial, and determined that he currently had no assets. Counsel asserted that the case would entail extensive litigation, speculating that the gun manufacturer would be joined and complicate the case with problems of discovery and experts.[4]

---

[3]Section 27706 of the Government Code outlines the duties of the public defender; subdivision (c) provides that "Upon request, the public defender shall defend any person who is not financially able to employ counsel in any civil litigation in which, in the judgment of the public defender, the person is being persecuted or unjustly harassed."

[4]Yarbrough's defense at the criminal trial was that the gun discharged as he was using it to strike the deceased who was attacking him. The pistol was a .45 Colt which he regularly carried with the trigger in a half-cocked position and a bullet in the chamber. The gun should not fire unless the hammer is pulled back, the grip safety is depressed, and the trigger is pulled.

The court recognized that, on the issue of liability, the evidence of the conviction would be admissible as an exception to the hearsay rule under Evidence Code section 1300. The court also noted that, as a practical matter, a judgment for damages against Yarbrough was "useless" even if not dischargeable in bankruptcy. Nevertheless, and without further inquiry, the court concluded that appointment of counsel was appropriate. When Mr. Wagner indicated he would decline to accept any gratuitous representation, the court stated: "I certainly have authority to order the appointment of counsel, and I will grant the request for appointment of counsel. But I feel I do not have the authority to order it to be a charge. If you want to test this by writ, I would welcome you to do so because I think this man ought to have an attorney. If there are any other findings that would facilitate that, I would be glad to accommodate the defendant. . . . Maybe you two, you know how I am ruling, could design an order that maybe both of you can agree on."

The trial court's "Order Denying Appointment and Compensation of Counsel" incorporated findings that Yarbrough was an indigent prisoner, that he had been served with process as a defendant in a civil action, that the litigation was not spurious and could affect his interests, that the county's contract with defense counsel in the criminal matter did not provide for representation in civil cases, and that the case would involve extensive legal work and investigation which would burden any attorney appointed by the court. The civil action has been stayed as to Yarbrough.

Yarbrough seeks a writ of mandate to compel the trial court to appoint counsel and to provide reasonable compensation to such counsel.

## II. *PAYNE* AND THE RIGHT TO ACCESS

In *Payne,* after concluding that no state interest could be advanced in support of denial of access to the courts (17 Cal.3d at pp. 919-922), the court addressed the particular remedies that were available to secure the right. One possible solution—to accord prisoners the right to a personal appearance—was discounted as not feasible so long as prisoners are denied the access to free legal services accorded to other indigents and are thus unable to prepare a propria persona defense. Another solution—to defer trial of action until the prisoner's release—was approved, bounded only by legal prohibition or substantial prejudice to the rights of plaintiffs. We recognized that, in some instances, the only solution—the only way to secure access—was the appointment of counsel.

We provided guidelines: "The access right . . . comes into existence only when a prisoner is confronted with a bona fide legal action threat-

ening his interests . . . . [T]he trial court should determine first whether the prisoner is indigent. If he is indigent and the court decides that a continuance is not feasible, it should then ascertain whether the prisoner's interests are actually at stake in the suit and whether an attorney would be helpful to him under the circumstances of the case. . . . [I]f the prisoner is not contesting the suit against him, or any aspect of it, there is no need for counsel; but if he plans to defend the action and an adverse judgment would affect his present or future property rights, an attorney should be appointed." (17 Cal.3d at p. 924.)

The proceedings to implement Yarbrough's access to the courts were extremely cursory insofar as the *Payne* guidelines were concerned. The findings of the trial court, prepared by counsel, are in large part a verbatim recitation of the *Payne* requirements. No one challenges them. Yarbrough got what he wanted—a declaration of entitlement to appointed counsel—although, in seeming contradiction to the dictates of *Payne,* he received no actual appointment. And for its part, the county received all that it wanted in the trial court's conclusion that it had no power to order the county to compensate counsel. In view of the nonadversary nature of the proceedings in the trial court and because the matter is before us on extraordinary writ, we are not compelled to accept the findings. (See generally Code Civ. Proc., § 909.) ■■■ We examine the entire proceedings to determine whether the court applied the proper standards in exercising its discretion on the motion before it.

Preliminarily, several amici suggest that the ruling on the need for appointment of counsel should follow a formal hearing at which the plaintiff in the civil case is required to appear and establish that if successful in the civil suit the prisoner could in fact respond in damages. We see no need to establish rigid requirements in this regard and merely note that if the court has reason to believe the plaintiff can and will provide information as to the prisoner's ability to respond in damages, attendance of the plaintiff should be sought. However, in one instance at least—when abatement or stay of the litigation is contemplated—the plaintiff should be given an opportunity to be heard.

■■■ ■■■ One of the criteria for appointment of counsel is that an adverse judgment will affect property rights. If the indigent presently has no property—and by definition he is not likely to have much—some assessment must be made as to the indigent's assertion that his interests are "actually at stake." If the guideline is read to encompass an incarcerated indigent no matter how remote his expectation of "future property interests," it is, for all intents and purposes, no guideline at all, for every incarcerated defend-

ant, viewing his world through rose-colored glasses, can anticipate release or commutation in time to return to the job market.

The court itself should evaluate the potential for loss to the prisoner, weighing such factors as age, term of incarceration, employment history, education, skills, family background and the likelihood of inheriting or otherwise obtaining property. The court may also consider the prisoner's prospects for earning money while in prison and accumulating sums to satisfy a civil judgment—royalties from books and songs come to mind. Undoubtedly there are other sources that might prove fruitful.

██ Here the court considered the issue of Yarbrough's present indigency, but, despite speculation that a judgment for damages would be "useless" to plaintiffs, no evidence whatever was received to permit an assessment of whether or how Yarbrough's future economic fortunes would be affected by a judgment against him.

██ In addition to finding a potential for loss that is not wholly ephemeral, the trial court must determine that counsel will be helpful to the prisoner *under the circumstances of the case*. The court should consider whether there are new questions of fact to be determined. The conviction itself will, of course, be admissible at the civil trial as an exception to the hearsay rule. (Evid. Code, § 1300.) ██ Further, the doctrine of collateral estoppel will preclude relitigation of the issues decided in the criminal prosecution. (*Teitelbaum Furs, Inc.* v. *Dominion Ins. Co., Ltd.* (1962) 58 Cal.2d 601 [25 Cal.Rptr. 559, 375 P.2d 439].) We stated in *Teitelbaum:* "Although [Teitelbaum] . . . did not have the initiative in his criminal trial, he was afforded a full opportunity to litigate the issue of his guilt with all the safeguards afforded the criminal defendant, and since he was charged with felonies punishable in the state prison . . . he had every motive to make as vigorous and effective a defense as possible. Under these circumstances, we hold that *any issue necessarily decided in a prior criminal proceeding is conclusively determined as to the parties if it is involved in a subsequent civil action.*" (*Id.,* at p. 606, italics added.) ██ In this case, the doctrine will preclude the relitigation of the issue of Yarbrough's state of mind at the time of the homicide as well as the theory of an accidental killing because of the alleged defectiveness of the weapon as the proximate cause of Cantrell's death—the main theory of the defense in the criminal action.[5]

---

[5]Our discussion of collateral estoppel is equally applicable to *any* civil action which Yarbrough may initiate. In that respect, we note that the waters have been muddied in the instant case by claims that Yarbrough's is a very complicated case, raising issues of products liability with its attendant expenditures of time and resources. The products liability issue, of course, requires the joinder of the Colt Firearms Company; Cantrell has not named Colt as a defendant. Collateral estoppel aside, the only role that Colt might play in this scenario

A determination by the trial court that counsel will not be helpful on the question of liability does not, however, foreclose the need for counsel on the issue of the amount of damages. Assuming that consideration of that issue is not preempted by a determination that no interests of the prisoner are "actually at stake," there remains the problem of minimizing the damage award. In that respect, one circumstance to consider is the multiplicity of defendants. Thus, in this case, the court should not ignore that the co-defendants, jointly and severally liable, will undoubtedly defend on the question of damages despite their position that Yarbrough alone is responsible for the death of Cantrell.

██ ██ One important guideline was ignored by the trial court entirely—whether access can be provided by abating the matter until the prisoner is released from custody and therefore better able to make his own arrangements. The feasibility of such abatement cannot be dismissed out of hand. In many instances it would seem a reasonable way of securing the civil defendant's access to the courts, requiring only the tolling of the statutory time prescriptions for prosecution on the obvious ground of impracticability. We are aware that justice delayed may be no justice at all, but postponement as a solution is not unknown to the law.[6]

██ As stated in *Payne,* postponement of the trial is not a reasonable alternative when the plaintiff may suffer substantial prejudice. ██ When, as here, the issue of liability is a foregone conclusion absent a reversal of the judgment on appeal, the potential for prejudice is minimal. With the passage of time, damages—the only issue which realistically remains to be litigated—will become more, not less, certain. It must be remembered that, however soon liability and damages are litigated, plaintiff's hope of recovery from an incarcerated indigent defendant cannot possibly take wing until his release from prison.[7]

---

is as defendant to a complaint or cross-complaint by Yarbrough. But Yarbrough's need for counsel as defendant in a civil suit is not measured by the potential for civil suits in his own name. *Payne* expressly limited its holding: It did not apply to indigent prisoners who are *plaintiffs* in civil actions. The fact that Yarbrough is considering a legal action against the manufacturer of the weapon should not have counted in the trial court's assessment of Yarbrough's need for counsel here.

[6]Application of section 352 of the Code of Civil Procedure, for example, may entail years of delay in the prosecution of a cause of action. Under its provisions, if a person entitled to sue is under a "disability"—imprisonment is recognized as such—"the time of such disability is not a part of the time limited for the commencement of the action." See also section 351, suspending the running of the statute when a defendant is absent from the state, and section 356, suspending the statute under an injunction or a statutory prohibition.

[7]As to a plaintiff's rights against other named defendants, no problem ensues. The proceedings need be deferred only as to the incarcerated defendant. Thus, in this case, the trial-setting date against the remaining defendant is set for September 23, 1985.

By the preceding discussion we seek to impress on the trial courts the need to exercise their discretion in as informed a manner as possible. At a minimum, then, the court is required to conduct the inquiry we outlined in *Payne* and clarified here: to consider the defendant's indigency, the feasibility of a continuance, whether defendant's interests are actually at stake, and whether counsel would be helpful under the circumstances of the case.

The record reveals that the court here did not seriously consider any factor other than indigency. Several of the findings—relating to defendant's "interests" and the usefulness of counsel—are unsupported by the evidence. We conclude, therefore, that the matter must be returned to the trial court for further proceedings in which the court, exercising its discretion in accord with the guidelines outlined above, reconsiders the question of how to effectuate Yarbrough's right of access to the courts.

We are fully aware that we have not dealt with the issues which have triggered the flood of amicus briefs mentioned in footnote 1: the power of the trial court to appoint an unwilling attorney to represent an incarcerated civil defendant, as well as its power and duty to provide funds for counsel's services and costs and, of course, the source of such funds. The fact that we find that it would be premature to discuss these issues in this particular case should not be interpreted to mean that we find that courts are powerless in those regards. The problem is, however, primarily a legislative one. It is our hope that the Legislature, working closely with the State Bar and other interested groups, will use the respite afforded by our disposition on this case to enact a fair legislative solution to the vexing problems which, for the time being, have been placed on the judicial backburner.

Let a peremptory writ of mandate issue, directing respondent court to conduct further proceedings in a manner consistent with this opinion.

Mosk, J., Broussard, J., Reynoso, J., Grodin, J., and Lucas, J., concurred.

**BIRD, C. J.**—I am disturbed by the majority's avoidance of the issues squarely presented by this case—(1) whether attorneys appointed to represent incarcerated, indigent civil defendants are entitled to compensation; (2) whether the courts possess the power to order such payment; and (3) what the source of such compensation is to be.

This court should confront these complicated issues now. Placing these vexing problems on the "judicial backburner" will only exacerbate the situation and further confuse the trial courts and the bar. I suspect these problems will not disappear nor will they become any more tractable with the

passage of time. In short, the majority would do well to heed the advice Lord Chesterfield gave to his son: "Never put off till tomorrow what you can do today."

I am also of the view that lawyers should not be forced to represent anyone without adequate compensation. The financial burden engendered by ensuring the constitutionally guaranteed right to counsel should not be placed on the shoulders of lawyers. That burden squarely rests with the state. If an attorney takes on the representation of an indigent, he or she should be properly compensated.

As with any other working person, lawyers should be properly compensated for their time and effort. Justice King aptly expressed these sentiments in his concurring opinion in the Court of Appeal. "No one would dare suggest courts have the authority to order a doctor, dentist or any other professional to provide free services, while at the same time telling them they must personally pay their own overhead charges for that time. No crystal ball is necessary to foresee the public outrage which would erupt if we ordered grocery store owners to give indigents two months of free groceries or automobile dealers to give them two months of free cars. Lawyers in our society are entitled to no greater privileges than the butcher, the baker and the candlestick maker; but they certainly are entitled to no less."

For the foregoing reasons, I respectfully dissent.