[No. B004588. Second Dist., Div. Six. Feb. 6, 1986.]

JUDSON CUNNINGHAM, Petitioner, v.
THE SUPERIOR COURT OF VENTURA COUNTY, Respondent;
COUNTY OF VENTURA et al., Real Parties in Interest.

338

COUNSEL

Harrington & Olney and Ronald G. Harrington for Petitioner.

No appearance for Respondent.

James L. McBride and Dorothy L. Schechter, County Counsel, and Dennis L. Slivinski, Assistant County Counsel, for Real Parties in Interest.

OPINION

**GILBERT, J.**—Petitioner Judson Cunningham is an attorney. Respondent is the superior court which ordered him to represent an indigent defendant in a paternity action instituted by the County of Ventura. Cunningham refused. The court held him in contempt. Cunningham seeks certiorari of the superior court's order holding him in contempt, and challenges the court's authority to compel him to perform pro bono representation.[1] We conclude that to require Cunningham to provide legal services without compensation is to deny him equal protection of the law.

### FACTS

Cunningham practices law in Ventura County. On December 20, 1983, the County of Ventura filed a paternity action against Manuel Jaramillo Martinez. This action sought to establish that Martinez is the father of a

---

[1]Cunningham filed a petition for a writ of prohibition. We treat this writ as one for certiorari. (*In re Coleman* (1974) 12 Cal.3d 568, 572 [116 Cal.Rptr. 381, 526 P.2d 533], fn. 2.)

minor child, to have him reimburse the County of Ventura for public assistance in the support of the child, and to require him to pay child support.[2]

Martinez claimed indigency, and moved to have the court appoint counsel to represent him. On February 3, 1984, the court appointed Cunningham, who practices law in Ventura County, to provide pro bono representation for Martinez. Cunningham was appointed pursuant to a plan designed by the Ventura County Bar Association and the superior court, for allocating free representation among lawyers who have their offices in Ventura County.

Cunningham probably did not participate in formulating the plan, because on February 16, 1984, he moved to be relieved from the appointment to represent Martinez. He stated that his practice was limited to personal injury matters, and that he had never handled a paternity case. He argued, among other things, that forcing him to represent Martinez was an unconstitutional denial of his right to equal protection of the law.

On March 28, 1984, the court found Cunningham in contempt of court for failure to comply with its order appointing him counsel of record for Martinez.

DISCUSSION

I

FEDERAL AND STATE<br>LAWS RELATING TO CHILD SUPPORT

In 1974, Congress amended the Social Security Act because the welfare rolls reflected that a significant number of children participating in the AFDC program were not being supported by their absent parents.[3] Congressional studies also established that "the largest single factor accounting for the increase in the AFDC rolls is illegitimacy."[4] Consequently, state and federal legislation was enacted to require absent parents of children receiving AFDC to repay all—or at least a portion—of the public funds spent in the support of their children. (42 U.S.C. § 654; 45 C.F.R. § 302.31; Welf. & Inst. Code, §§ 11350, 11350.1, 11475 et seq.; see also *Salas* v. *Cortez*

---

[2]Welfare and Institutions Code section 11350 obligates noncustodial parents to reimburse the county for public assistance provided to their minor children.

[3]Note, *Child Support Enforcement and Establishment of Paternity as Tools of Welfare Reform* (1976) 52 Wash. L.Rev. 169, 170-172.

[4]*Id.*, at page 170, footnote 19.

(1979) 24 Cal.3d 22, 29-32 [154 Cal.Rptr. 529, 593 P.2d 226]; *County of Santa Clara* v. *Support, Inc.* (1979) 89 Cal.App.3d 687, 694-700 [152 Cal.Rptr. 754].)

Federal and California laws require that a parent assign to the county his or her right to child support from the absent parent as a condition of receiving Aid to Families with Dependent Children (AFDC). The parent receiving aid must also agree to assist in proving the paternity of any illegitimate child for whom aid is claimed. (42 U.S.C. § 602(a)(26)(A); 45 C.F.R. § 232.11; Welf. & Inst. Code, § 11477.) California law permits the district attorney to bring actions to prove paternity of children receiving AFDC. (Welf. & Inst. Code, §§ 11475.1, 11476.)

## II

### REPRESENTATION OF INDIGENTS IN CIVIL CASES

In *Salas* v. *Cortez, supra,* 24 Cal.3d page 34, our Supreme Court held that an indigent defendant in a paternity suit filed by the state is entitled to appointed counsel. In *County of Ventura* v. *Tillett* (1982) 133 Cal.App.3d 105, 114 [183 Cal.Rptr. 741], the appellate court held that an indigent sued by the district attorney for failure to pay child support is constitutionally entitled to the appointment of free legal counsel. *Salas* and *Tillett* left open the hard question of how recruitment of counsel should take place.[5]

### A. CONSCRIPTION OF PRO BONO COUNSEL—THE TRADITIONAL VIEW

In paternity and support cases, the court usually attempts to appoint competent private attorneys who are willing to serve without compensation. If the court is unsuccessful in obtaining such counsel, it may feel obliged to appoint unwilling counsel to fill the role of pro bono advocate.

Respondent relies upon Business and Professions Code section 6068 in support of its power to conscript attorneys for pro bono representation on behalf of indigents. Section 6068 provides it is the duty of an attorney "(h) Never to reject, for any consideration personal to himself, the cause of the defenseless or the oppressed."

Respondent contends that in *Payne* v. *Superior Court* (1976) 17 Cal.3d 908 [132 Cal.Rptr. 405, 553 P.2d 565], the California Supreme Court in-

---

[5]One thing is certain; the public defender may not be recruited to represent indigents in civil support and paternity actions. (Gov. Code, § 27706; *Littlefield* v. *Superior Court* (1979) 98 Cal.App.3d 652 [160 Cal.Rptr. 175].)

terpreted section 6068 as requiring members of the private bar to serve gratuitously where the Legislature has not appropriated funds with which to pay counsel for indigents. *Payne* held that, in certain instances, an incarcerated indigent defendant whose interests are threatened as a result of a civil lawsuit, has a constitutional right to representation. In footnote 6 at page 920, the court said, "[t]he state also apparently assumes that if this court orders counsel appointed in certain cases, it will mandate that counsel be paid from public funds. We do not assert such power. If and how counsel will be compensated is for the Legislature to decide. Until that body determines that appointed counsel may be compensated from public funds in civil cases, attorneys must serve gratuitously in accordance with their statutory duty not to reject 'the cause of the defenseless or the oppressed.' (Bus. & Prof. Code, § 6068, subd. (h).)"

In *Yarbrough* v. *Superior Court* (1985) 39 Cal.3d 197 [216 Cal.Rptr. 425, 702 P.2d 583], our Supreme Court expressed the hope that the Legislature would solve the problem of compensation for attorneys, but reaffirmed the right of an indigent inmate to have access to the courts in civil cases. Although *Yarbrough* placed the question of whether a court may appoint an unwilling attorney to represent an indigent on the "judicial back burner," here, the issue is boiling over.

Respondent concludes that the Supreme Court in *Payne* found that attorneys may be required to act as pro bono counsel in certain lawsuits. We disagree with this conclusion because we do not believe the *Payne* majority intended to make a ruling with such profound constitutional implications, based on dicta in a footnote.

The dissent in *County of Fresno* v. *Superior Court* (1978) 82 Cal.App.3d 191, 199 [146 Cal.Rptr. 880], stated that "[t]he thrust of the controversy in *Payne* was on the 'right to counsel.' There simply was no written argument on the issue of compensation (and in particular about compensation when legal services were unavailable due to conflicts). The parties in *Payne* just assumed the compensation issue would be resolved as a matter of course. In short, the matter of payment from public funds was never fully briefed, fully argued, or fully considered by the parties.

"I cannot agree that the Supreme Court has made a definitive ruling on the subject. The matter is still an open question. In such a situation, an intermediate appellate court should try to bring areas of legal uncertainty to light and sharpen the issues for ultimate consideration by the Supreme Court."

At the time *Payne* was decided, many people may have assumed that the newly created and federally funded Legal Services Corporation would pro-

vide access for all civil litigants to the courts. (See 42 U.S.C. §§ 2996-2996j.) During the years 1976-1981, there was a steady growth in the ranks of lawyers employed to assist the poor in civil law matters. In 1981, however, Congress cut funding for the following fiscal year, 1982, by 25 percent. (Legal Services Corp. Act Amend. of 1981, Rep. No. 97-97 to accompany H.R. No. 3480; see also Bus. & Prof. Code, § 6210.)[6]

Respondent's contention that the court has power to impress unwilling counsel finds support in *Rowe* v. *Yuba County* (1860) 17 Cal. 62, and in some recent appellate decisions. (*County of Tulare* v. *Ybarra* (1983) 143 Cal.App.3d 580, 586 [192 Cal.Rptr. 49]; *County of Los Angeles* v. *Superior Court* (1980) 102 Cal.App.3d 926, 930-931; and *County of Fresno* v. *Superior Court, supra,* 82 Cal.App.3d at p. 194.)

The courts in these opinions subscribed to the unquestioned notion that the uncompensated impressment of attorneys is justified because the practice of law, as distinguished from other trades, ". . . is a professional privilege conferred by the state, one of the conditions of which is that the attorney not reject 'the cause of the defenseless or oppressed' (Bus. & Prof. Code, § 6068, subd. (h))." (*County of Fresno* v. *Superior Court, supra,* 82 Cal.App.3d at p. 196.)

The court in *County of Fresno* noted that "the vast majority" of states are of the view that appointed counsel for indigents do not have a constitutional right to compensation. (*County of Fresno* v. *Superior Court, supra,* 82 Cal.App.3d at p. 196.) These states appear to require that unwilling counsel be forced to represent indigents. (E.g., see *United States* v. *Dillon* (9th Cir. 1965) 346 F.2d 633, 636, cert. den., 382 U.S. 978 [15 L.Ed.2d 469, 86 S.Ct. 550]; *Sparks* v. *Parker* (Ala. 1979) 368 So.2d 528, 532; *Lindh* v. *O'Hara* (Del. 1974) 325 A.2d 84, 92; *Ex parte Dibble* (1983) 279 S.C. 592 [310 S.E.2d 440, 442-443]; Note, *The Indigent's "Right" to Counsel in Civil Cases* (1975) 43 Fordham L.Rev. 989, 1002-1008.)

In rejecting the claim that compelled representation of an indigent in a criminal case constituted a taking of property without just compensation, the court in *United States* v. *Dillon, supra,* 346 F.2d 633, 636, remarked that the bar's duty to represent indigents upon court order is "an ancient tradition of the legal profession" dating back to fifteenth century England

---

[6]Although there has been some restoration of funding, legal aid programs, even when funded at their pre-1982 levels, provided legal assistance to a remarkably small 20 percent of the estimated 30 million poor people in this county. (Swygert, *Should Indigent Civil Litigants in The Federal Courts Have a Right to Appointed Counsel?* (1982) 39 Wash. & Lee L.Rev. 1267; *Quail* v. *Municipal Court* (1985) 171 Cal.App.3d 572, 587 [217 Cal.Rptr. 361], fn. 10 (dis. opn. of Johnson, J.).)

and colonial America. "An applicant for admission to practice law may justly be deemed to be aware of the traditions of the profession which he is joining, and to know that one of these traditions is that a lawyer is an officer of the court obligated to represent indigents for little or no compensation upon court order. Thus, the lawyer has consented to, and assumed, this obligation and when he is called upon to fulfill it, he cannot contend that it is a 'taking of his services.'" (*Id.*, at p. 635.)

Those courts that comprise the so-called majority view look wistfully back upon a halcyon era when it was imagined that members of the legal profession, without any hesitation, stepped forward to provide free representation for indigents. Thus, it is concluded that "[r]epresentation of indigents is a traditional professional obligation of the bar, which the lawyer undertakes when he becomes a member of the bar." (*United States* v. *Dillon, supra,* 346 F.2d at p. 636.) The source of this duty is said to be "deeply rooted" in the common law notion that an attorney, as an officer of the court, has an obligation to provide free representation to indigents (*Jackson* v. *State* (Alaska 1966) 413 P.2d 488, 490; *Williamson* v. *Vardeman* (8th Cir. 1982) 674 F.2d 1211, 1215.); or that the lawyer's duty arises out of the obligation of the legal profession to provide pro bono services as part of its commitment to public service. (*In re Snyder* (8th Cir. 1984) 734 F.2d 334, 338-339.)

## B. An Historical Glimpse at Pro Bono Services—A Different Picture

A careful examination of the "deeply rooted" and "ancient tradition" reveals a custom far more honored in its breach than in its observance. During the years following the *Rowe* decision, it is doubtful that many California lawyers donated much in the way of free legal services to indigents in civil cases. The dearth of California appellate cases relating to the rights of indigents during the years which preceded the founding of federally funded legal aid programs suggests that the extent of pro bono services offered by members of the bar was small.

Most of the cases that deal with the rights of indigents in civil cases have been decided within the last 15 years. (E.g., *Serrano* v. *Priest* (1971) 5 Cal.3d 584 [96 Cal.Rptr. 601, 487 P.2d 1241, 41 A.L.R.3d 1187] [increased state funding for school districts located in low income neighborhoods]; *Randone* v. *Appellate Department* (1971) 5 Cal.3d 536 [96 Cal.Rptr. 709, 488 P.2d 13] [attachment law violated debtor's right of due process]; *Earls* v. *Superior Court* (1972) 6 Cal.3d 109 [98 Cal.Rptr. 302, 490 P.2d 814] [waiver of court filing fees for indigents]; *Conover* v. *Hall* (1974) 11 Cal.3d 842 [114 Cal.Rptr. 642, 523 P.2d 682] [right of welfare

recipients to deduct work-related expenses]; *Knight* v. *Hallsthammar* (1981) 29 Cal.3d 46 [171 Cal.Rptr. 707, 623 P.2d 268] [right of low income tenants to decent housing]; *Robbins* v. *Superior Court* (1984) 38 Cal.3d 199 [211 Cal.Rptr. 398, 695 P.2d 695] [right of general relief recipients to select residence].)

Those precedents that seemingly support a court's power to conscript an unwilling attorney on the notion that an attorney is an "officer of the court," are based upon a misunderstanding of the structure of the British court system. If those cases "are examined with some care, it turns out that the claimed majority is not so nearly solid or so monolithic." (Shapiro, *The Enigma of the Lawyer's Duty to Serve, op. cit.* (1980) 55 N.Y.U. L.Rev. 735 at p. 755.)

"The role of the English 'attorney' has no counterpart in this country. Unlike barristers [the counterpart of American lawyers], attorneys 'were admitted directly by the judges of the court' and medieval statutes gave the court direct control over these officers. [Citation] The role of the attorney, as an officer of the court, resembled the role performed by staff members of the court engaged in ministerial duties. [Citation]" (*State* ex rel. *Scott* v. *Roper* (Mo. 1985) 688 S.W.2d 757, 765.)

Some commentators maintain that the view of the bar's obligation to provide free legal services as part of an "ancient tradition of the bar" is grossly inaccurate. In 1980, Harvard law professor David Shapiro examined a number of British and American eighteenth and nineteenth century cases involving appointment of counsel, and discussed the question of a court's authority to compel an unwilling private attorney to represent an indigent.

Shapiro concluded: "To justify coerced, uncompensated legal services on the basis of a firm tradition in England and the United States is to read into that tradition a story that is not there. The occasions on which lawyers have given their time and abilities at little or no cost—either on their own initiative or at a court's request—are surely beyond counting. And the sense that doing so is a fulfillment of a high professional aspiration has often been expressed. [Fn. omitted.] But the notion that an unwilling lawyer could be forced to serve without fee, though not without its advocates over the centuries, seems never to have found universal acceptance. At least before the latter part of the nineteenth century, that notion is even harder to document in particular instances than it is to support with general pronouncements . . . ." (Shapiro, *The Enigma of the Lawyer's Duty to Serve, op. cit. supra,* 55 N.Y.U. L.Rev. at p. 753.)

Luther M. Swygert, Senior Judge, United States Court of Appeals for the Seventh District, in his discussion of the history of the right to counsel in

civil cases in England from 1216 to the present date, wrote, "Even if an indigent civil plaintiff gained access to the courts, judges rarely exercised their power to appoint counsel. Aside from the serjeants-at-law, who were officers of the court in the truest sense, there was substantial doubt about a judge's power to compel an unwilling private lawyer to donate his services. While the basis of objections by lawyers to representation of the poor was clearly pecuniary, the failure of the English judiciary to enforce the letter and spirit of the 1495 statute was problematic. Class antagonism may have played some part, but the English trial judges were also concerned about abuses by bad-faith claimants and had an understandable opposition to a greatly increased work load. [Fns. omitted.]" (Swygert, *Should Indigent Civil Litigants in the Federal Courts Have a Right to Appointed Counsel? supra*, 1267, 1270-1273.) Notably, in 1949, the British government enacted legislation providing funds for legal counsel appointed to represent the poor in civil matters. (*Id.*, at p. 1273.)

### C. The Changing Status of Attorneys in American Society

Once upon a time, lawyers occupied a privileged niche in English society. "As officers of the court, attorneys fell within the purview of the privileges accorded to the court, such as being exempted from suit in another court, serving in the militia, or being compelled to hold some other office (a general obligation imposed on subjects of the King)." *State* ex rel. *Scott* v. *Roper, supra,* 688 S.W.2d at p. 766.) Likewise, during the early history of the United States, attorneys occupied a privileged role. Nearly every important American politician in the first fifty years of the Nineteenth Century was an attorney. (Smith, *The Nation Comes of Age* (1981) at p. 153.)

Alexis De Tocqueville, in his work on society in the United States in the post Jacksonian era, observed that lawyers of that period occupied a powerful niche, ". . . somewhat like the Egyptian priests, being, as they were, the only interpreters of an occult science." (*Democracy in America* (1975 ed.) at p. 267.) Tocqueville made the following observations on the role of attorneys in American society:

"Democratic government favors the political power of lawyers. When the rich, the noble, and the prince are excluded from the government, the lawyers step into their full rights, for they are the only men both enlightened and skillful, but not of the people, whom the people can choose.

". . . By birth and interest a lawyer is one of the people, but he is an aristocrat in his habits and tastes . . .

". . . In America there are neither nobles nor men of letters, and the people distrust the wealthy. Therefore the lawyers from the political upper class and the most intellectual section of society . . ."

"If you ask me where the American aristocracy is found, I have no hesitation in answering that it is not among the rich, who have no common link uniting them. It is at the bar or the bench that the American aristocracy is found." (*Id.,* at pp. 266-268.)

Today's attorney holds a less privileged position than he did in the past. For example, recent years have witnessed the removal of a number of obstacles designed by the legal profession to prevent competition. (E.g., see *Bates* v. *State Bar* (1977) 433 U.S. 350 [53 L.Ed.2d 810, 97 S.Ct. 2691]; *Goldfarb* v. *Virginia State Bar* (1975) 421 U.S. 773 [44 L.Ed.2d 572, 95 S.Ct. 2004]; *Jacoby* v. *State Bar* (1977) 19 Cal.3d 359 [138 Cal.Rptr. 77, 562 P.2d 1326].)

The steady movement toward demystification of legal pleadings and forms has encouraged nonlawyers to argue their own causes. (E.g., see Civ. Code, § 4550; Code Civ. Proc., §§ 527.6, 541 et seq.; Cal. Rules of Court, rule 982.1) Jurisdiction of small claims court has been increased. (Code Civ. Proc., §§ 116.1, 116.2.) State policy has encouraged arbitration as an alternative to judicial resolution of disputes. (*Madden* v. *Kaiser Foundation Hospital* (1976) 17 Cal.3d 699, 706 [131 Cal.Rptr. 882, 552 P.2d 1178]; see also Kline, *Law Reform and the Courts: More Power to the People or to the Profession?* (1978) 53 State Bar J. 14, 20-23.)

Although the special preserves of the legal profession have been significantly reduced in recent years, the cost of running a law office has greatly increased. It has been estimated that a lawyer's overhead costs equal as much as one-half of his or her gross income. (See, e.g., *State* v. *McKenney* (1978) 20 Wn.App. 797 [582 P.2d 573, 576-578].)

Things were different in 1860 when the court in *Rowe* v. *Yuba County, supra,* 17 Cal. 61, held that in the absence of a statute, an attorney appointed by the court to represent an indigent person is not entitled to compensation. The dissent in *County of Fresno* v. *Superior Court, supra,* 82 Cal.App.3d at p. 202, made the following observation: "The attorney at the time of *Rowe* had virtually no overhead. 'He did not have to purchase any complicated office equipment. His library expenses were almost nil. He had no staff to pay. Rent was low. There was no such thing as telephone, jet transportation, and all the other enormous expenses that every busy practitioner encounters today.' (Hunter, *Slave Labor in the Courts—A Suggested Solution* (July-Aug. 1969) 74 Case & Com. 3, 8.) To make a decent living

today, the attorney has to handle a tremendous number of cases—much more than was required at the inception of the rule of *Rowe*. Furthermore, expanding concepts in law have increased the volume of assignments, the complexity of the issues involved, and a mushrooming of the duties involved in an appointed case.''

Even at the time of *Rowe,* the myth that lawyers occupied a special station, and were obliged thereby to render free legal services to indigents, was laid to rest in Indiana in *Webb* v. *Baird* (1854) 6 Ind. 13. The Indiana Supreme Court rejected the contention that the bar, being granted special privileges, was under *noblesse oblige* to provide uncompensated services.

"The idea of one calling enjoying peculiar privileges, and therefore being more honorable than any other, is not congenial to our institutions. And that any class should be paid for their particular services in empty honors, is an obsolete idea, belonging to another age and to a state of society hostile to liberty and equal rights." (*Webb* v. *Baird, supra,* 6 Ind. at p. 16.)

### III

#### THE IMPRESSMENT OF CUNNINGHAM TO HANDLE PRO BONO LITIGATION DENIED HIM EQUAL PROTECTION OF THE LAW.

Cunningham contends that by being singled out as a member of a class (attorneys) to render his services without compensation, he is denied equal protection of the law.

Several courts have held unconstitutional the conscription of attorneys to perform pro bono representation of indigent defendants. (*State* ex rel. *Scott* v. *Roper, supra,* 688 S.W.2d 757; *Menin* v. *Menin* (1974) 79 Misc.2d 285, 359 N.Y.S.2d 721; *Bradshaw* v. *Ball* (Ky. 1972) 487 S.W.2d 294; Shapiro, *The Enigma of the Lawyer's Duty to Serve, supra,* 55 N.Y.U. L.Rev. at pp. 759-762.)

The right to practice law, or to engage in any occupation requiring a state license, must not be predicated upon the relinquishment of constitutional rights. (*Baird* v. *State Bar* (1971) 401 U.S. 1 [27 L.Ed.2d 639, 91 S.Ct. 702]; *Willner* v. *Committee on Character and Fitness* (1963) 373 U.S. 96, 102 [10 L.Ed.2d 224, 228-229, 83 S.Ct. 1175, 2 A.L.R.3d 1254]; *Bagley* v. *Washington Township Hospital Dist.* (1966) 65 Cal.2d 499, 505 [55 Cal.Rptr. 401, 421 P.2d 409].)

"The first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that

affects two or more *similarly situated* groups in an unequal manner." (italics in original) (*In re Eric J.* (1979) 25 Cal.3d 522, 530 [159 Cal.Rptr. 317, 601 P.2d 549].) A measure which adversely affects a "fundamental right," or creates a "suspect classification," will be subject to the strict scrutiny test. (*Sail'er Inn* v. *Kirby* (1971) 5 Cal.3d 1, 16-17 [95 Cal.Rptr. 329, 485 P.2d 529].) In all other cases, the reviewing court uses the less stringent "rational relationship" test. (*D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1, 16 [112 Cal.Rptr. 786, 520 P.2d 10].) Under the latter standard, the court determines whether a classification under review bears some "rational relationship" to a legitimate state purpose. (*In re Arthur W.* (1985) 171 Cal.App.3d 179, 185 [217 Cal.Rptr. 183].)

The right to pursue one's chosen profession is not a fundamental right for the purpose of invoking the strict scrutiny test. *Bib'le* v. *Committee of Bar Examiners* (1980) 26 Cal.3d 548, 555 [162 Cal.Rptr. 426, 606 P.2d 733]; *D'Amico* v. *Board of Medical Examiners, supra,* 11 Cal.3d at p. 17.) Thus, we are obliged to review the appointment of attorneys without compensation under the rational relationship test.

It is a legitimate state function to assist the poor (*The Housing Authority* v. *Dockweiler* (1939) 14 Cal.2d 437, 450 [94 P.2d 794]), but, under the Constitution, this goal cannot be accomplished at the expense of one particular group of people. It is a denial of equal protection when the government seeks to charge the cost of operation of a state function, conducted for the benefit of the public, to a particular class of persons. (*Norwood* v. *Baker* (1898) 172 U.S. 269, 279 et seq. [43 L.Ed. 443, 447 et seq., 19 S.Ct. 187]; *In re Jerald C.* (1984) 36 Cal.3d 1, 6 [201 Cal.Rptr. 342, 678 P.2d 917]; *Dept. of Mental Hygiene* v. *Kirchner* (1964) 60 Cal.2d 716, 723 [36 Cal.Rptr. 488, 388, P.2d 720, 20 A.L.R.3d 353] (remanded 380 U.S. 194 [13 L.Ed.2d 753, 85 S.Ct. 871]); sub. opn. 62 Cal.3d 586.) "To charge the cost of operation of state functions conducted for public benefit to one class of society is arbitrary and violates the basic constitutional guarantee of equal protection of law. [citation.]" *In re Jerald C., supra,* 36 Cal.3d at p. 6.)

An attorney who is appointed to represent an indigent without compensation is effectively forced to give away a portion of his property—his livelihood. Other professionals, merchants, artisans, and state licensees, are not similarly required to donate services and goods to the poor.

As one commentator has noted: "It is unfair to put on any working group the burden of providing for the needy out of its stock in trade. No one would suggest that the individual grocer or builder should take the responsibility of providing the food and shelter needed by the poor. The same

conclusion applies to the lawyer. The lawyer's stock in trade is intangible—his time fortified by his intellectual and personal qualities, and burdened by his office expenses. To take his stock in trade is like stripping the shelves of the grocer or taking over a subdivision of the builder.'' (Cheatham, *Availability of Legal Services: The Responsibility of the Individual Lawyer and of the Organized Bar* (1965) 12 UCLA L.Rev. 438, 444; see also, *The Uncompensated Appointed Counsel System: A Constitutional and Social Transgression* (1972) 49 Ky. L.J. 710, 715.

In 1940, the Indiana Supreme Court commented that, ''[i]n these modern times practioners of the professions and of many arts, sciences, trades, and businesses are required to be licensed. The Legislature may in the future require the licensing of restaurant owners and grocers as a sanitary police measure. If a law should be enacted requiring every person licensed by the state to render services, or furnish the materials of their business, to paupers gratuitously, much difficulty would be found in justifying a decision holding the law unconstitutional as depriving the green grocer or the restaurant operator of his goods, or as depriving the physician, or the barber, or the plumber, or the electrician, or the mechanical engineer of his services, without compensation, while adhering to a rule that licensed attorneys' services may be taken without compensation.'' (*Knox County Council* v. *State* (1940) 217 Ind. 493 [29 N.E.2d 405, 412].)

As a general rule, the imposition of a reasonable burden as a condition of licensing does not offend constitutional principles. (*Ohralik* v. *Ohio State Bar Assn.* (1978) 436 U.S. 447, 460-462 [56 L.Ed.2d 444, 456-458, 98 S.Ct. 1912].) Conditions of licensing may include, for example, the taking of exams, the payment of dues, or completion of courses to achieve certification as a specialist. In this way the state protects the public by prohibiting those who are not licensed, and presumably not competent, from engaging in the practice of certain professions. (See *Lupert* v. *California State Bar* (9th Cir. 1985) 761 F.2d 1325, 1328; *Abar* v. *Rogers* (1981) 124 Cal.App.3d 862, 865 [177 Cal.Rptr. 655] and *Payne* v. *De Vaughn* (1926) 77 Cal.App. 399, 403 [246 P. 1069].)

Requiring lawyers to devote a reasonable amount of time to represent indigent defendants in paternity cases as a condition of licensing, might not offend constitutional principles if all lawyers were to bear the burden evenly. But, those lawyers who specialize in the nonlitigation aspects of such diverse areas of law as tax, corporation, entertainment, real estate, and business, may have never seen the inside of a courtroom. Although there may be some exceptions, it is not likely that members of this class of attorneys, who lack training and experience in litigation, would be selected to represent indigents in paternity cases.

If the court only appoints lawyers having litigation experience or skill, then the burden will fall solely upon trial lawyers. Yet, trial lawyers possess no special privileges that are not shared by lawyers who do not do trial work. As a subclass within the general class of lawyers, trial lawyers would then be singled out to bear the burden that other lawyers would not have to bear. It therefore appears that insuperable obstacles stand in the way of any attempt to allocate pro bono work in paternity cases so as not to offend equal protection principles.

There are further obstacles. How shall the court exercise its discretion so that the burden will be fairly distributed among members of the bar? Shall the struggling sole practitioner bear the same responsibility as the senior partner in a 200-person law firm supported by a lucrative corporate practice? Irrespective of how this problem is resolved, we assume the court will appoint only competent counsel. Shall this then be a reward for incompetence, and a punishment for competence? We cannot tell whether such a determination was made in this case. Cunningham is a trial attorney, but the uncontroverted evidence before the trial court was that he lacked the skill to try paternity cases. Nevertheless, Cunningham was selected to perform pro bono work and to incur the necessary costs of litigation.

We cannot envision a method of alleviating the trial courts' impossible burden of selecting counsel. In this case, members of the bar, with offices in Ventura County, were randomly selected, irrespective of their specialty or expertise. Attorneys whose offices were not in Ventura County were excluded, along with attorneys who are legislators, inactive, or full time employees of public agencies.

Other schemes to appoint attorneys present similar problems. If attorneys are to be chosen from a lottery, for example, who should be included? Some of the potential nominees that come to mind when we conjure up a list include the following:

(1) attorneys who live, but do not work in the particular jurisdiction involved;

(2) attorneys who work in the particular jurisdiction involved, but do not belong to the local bar association;

(3) attorneys whose offices are located in other judicial districts, but who belong to the local bar association of the particular jurisdiction involved; (There are also numerous bar associations whose members share such common interests as specialty, ethnicity, geographic location);

(4) attorneys employed by public agencies other than the public defender; (Here the court must bear in mind statutory prohibitions as well as possible conflicts of interest);

(5) attorneys licensed to practice law, but who are engaged in other pursuits such as business, teaching or politics;

(6) attorneys who serve as pro tem judges, or participate in volunteer pro bono programs; (Should they be excluded from the lottery? How does one determine the extent of their participation in these programs?).

We leave it to others to contemplate even greater *bêtes noires* by adding new combinations and categories to our list.[7] The preceding examples, however, illustrate how equal protection principles are violated when one attempts to apply a general rule of forced pro bono representation on such a diverse class as lawyers.

At the root of the problem is the lack of state-appropriated funds with which to compensate defense counsel in these matters. Constitutional rights are not measured or limited by monetary considerations. ". . . [V]indication of conceded constitutional rights cannot be made dependent upon any fact that it is less expensive to deny than to afford them." (*Watson* v. *Memphis* (1963) 373 U.S. 526, 537 [10 L.Ed.2d 529, 538, 83 S.Ct. 1314]; see also, *Arreola* v. *Municipal Court* (1983) 139 Cal.App.3d 108, 113-114 [188 Cal.Rptr. 529].)

Two constitutional rights conflict here. On the one hand, indigent defendants are constitutionally entitled to legal counsel in state-initiated paternity actions. On the other, it is a denial of equal protection of the law to require a particular class of persons to pay for the cost of this representation. It would be ironic to provide justice to the indigent litigant but to deny it to his attorney.

Welfare and Institutions Code section 11475 is part of a statutory scheme designed to recoup public funds expended on behalf of AFDC recipients and thereby to alleviate the burden on the taxpayer. (See *ante* at pp. 339-340; see also *City and County of San Francisco* v. *Thompson* (1985) 172 Cal.App.3d 652, 656-657 [218 Cal.Rptr. 445].) It is incumbent upon the Legislature, which created the statute, to provide the financial support nec-

---

[7] We feel much like The Lord High Executioner describing his list of potential victims, whose "Loss will be a distinct gain to society at large," who concludes that "The task of filling up the blanks I'd rather leave to you, But it really doesn't matter whom you put upon the list, For they'd none of 'em be missed—they'd none of 'em be missed!" *The Mikado,* Act I, Sir William S. Gilbert.

essary to meet its requirements. If the state does not wish to appropriate funds sufficient to pay for appointed counsel, it cannot expect the legal profession to fill the void by subsidizing a cost that should be borne by the tax-paying public.

When the state undertakes to prosecute a paternity or child support action against an indigent, it must bear the expenses necessary to comply with the provisions of the state and federal constitutions. These expenses include the compensation of counsel for the indigent defendant. When the court appoints unwilling counsel to represent indigent defendants, it singles out members of the legal profession to indemnify the state for services that ought to be borne by the general tax-paying public.

We are mindful that *County of Fresno* v. *Superior Court, supra; County of Los Angeles* v. *Superior Court, supra,* 102 Cal.App.3d 926; and *County of Tulare* v. *Ybarra, supra,* 143 Cal.App.3d 580, reached the conclusion that appointed counsel in civil cases must serve without compensation. These cases, however, did not review the constitutionality of a specific plan, such as the one here, devised to conscript counsel to represent indigent litigants. *County of Tulare* deals with the trial court's power to dismiss a civil suit where it is unable to locate private counsel to represent the indigent. *County of Fresno,* and *County of Los Angeles* involve the propriety of trial court orders granting compensation to counsel appointed to represent indigents in civil cases.

## IV

### THE POLICY DISADVANTAGES
### OF COMPELLED ALTRUISM

#### A. COMPULSORY PRO BONO SERVICES DISCOURAGE
#### ATTORNEY PARTICIPATION IN VOLUNTARY PROGRAMS

It is commendable that many lawyers in this state participate in a variety of voluntary pro bono programs.[8] We admire and encourage these noble

---

[8]The State Bar of California, Office of Legal Services Voluntary Legal Services Program offers a booklet entitled, "Coming to the Aid of Legal Services." This booklet offers profiles of some local bar pro bono programs which exemplify the variety and scope of ongoing programs throughout the state. The programs profiled are Amicus Publico, Orange County; Fresno County Voluntary Legal Services Program; Napa County Legal Assistance Agency; Pro Bono Publico Program, Riverside County; Public Counsel, Los Angeles County; Public Service Law Corporation, Riverside County; Seniors' Law Project, Kern County; Ventura Free Legal Clinic, Ventura County; Voluntary Legal Services Program, Alameda County; Volunteer Legal Services Program, Santa Barbara County.

We also recognize that lawyers as well as others provide financial assistance to public interest law firms such as the American Civil Liberties Union, Mexican American Legal Defense and Education Fund, NAACP Legal Defense Fund, Pacific Legal Foundation, and Public Advocates.

efforts and hope they increase,[9] but there is the danger that impressment of attorneys to handle the defense of paternity and child support matters may dampen enthusiasm of attorneys to participate in existing pro bono programs. This, of course, would injure these worthwhile programs, many in their infancy, and barely surviving on meager resources.

### B. Denial of Right to Effective Assistance of Counsel.

Compelled representation without compensation, which denies the attorney equal protection of the law, may also deprive the indigent of effective assistance of counsel. The county argues that the trial of paternity actions does not require that the lawyer have exceptional expertise. In some cases this may be true, but Cunningham has stated that he lacks the necessary experience in this kind of case to properly represent Martinez. The Code of Professional Responsibility, Disciplinary Rule DR 6-101 prohibits an attorney from providing services in an area of law in which he or she is unfamiliar. (See *Lewis* v. *State Bar* (1981) 28 Cal.3d 683, 689 [170 Cal.Rptr. 634, 621 P.2d 258].)

If we require attorneys to work without compensation, we may unwittingly create a form of second-class representation in some cases. Surely, this is not what the Supreme Court had in mind when it ruled that paternity and support matters involve issues of constitutional magnitude, and thereby require the appointment of counsel. (*Salas* v. *Cortez, supra,* 24 Cal.3d at pp. 27-29.) The Supreme Court intended that indigent defendants have the benefit of *effective* assistance of counsel.

The Court of Appeal in *Luke* v. *County of Los Angeles* (1969) 269 Cal.App.2d 495, 499 [74 Cal.Rptr. 771], stated: "Effective representation today requires counsel experienced in the particular field of law involved. [Citations.] Yet to acquire this experience and maintain an acceptable level of competency in a given field of the law demands continuous study, application and practice. We think the days are past when a lawyer could be expected to do this solely as public service. If society is to demand representation by counsel in an expanding variety of proceedings and to insist on a high level of competency in the performance of such representation, then counsel should be paid. Is it reasonable today to attach to a statute which provides for court-appointed counsel in a custodial proceeding an interpretation that appointed counsel will render his services for nothing? We think not."

---

[9]In the wake of inadequate funding in legal assistance programs, it becomes particularly urgent that members of the bar intensify their efforts to carry a greater portion of the responsibility to provide representation to the poor.

The following observation was made 67 years ago: "The courts do appoint lawyers to defend such persons—but are they really defended? These attorneys serve without compensation, except that in some states a fee is paid in murder cases. . . . On very rare occasions distinguished counsel is assigned to defend a prisoner, but, as a general rule, these assignments go to young and inexperienced attorneys—very often to the practitioner who happens to be in court at the time . . . . The classes of lawyers who are usually assigned to defend, present a phase of this question which cannot be regarded as unimportant. It is a regrettable fact that in nearly all communities (particularly in the larger cities) there is a type of lawyers [sic] who are [sic] not truly representative of a great profession. Their regard for the rights and liberties of their clients is measured solely from a commercial or financial standpoint. These are more persistent than any other lawyers in their search for clients. Too frequently their services, if rewarded by small fees, are half-hearted or openly negligible. This leaves their clients practically or wholly unprotected. They are commonly referred to as 'shysters,' but also described as 'snitch lawyers,' 'jail lawyers,' 'vampires,' 'legal vermin,' 'harpies' and by other inelegant but extremely emphatic phraseology. They are grasping and mercenary—without character ability or conscience. They prey upon the ignorance or fear of the prisoner, or of his relatives or friends, in their effort to extort a fee. If it be not forthcoming (or often when it is) they advise the prisoner to plead guilty, on the pretext that he will get greater leniency from the court than by standing trial. He may at times go through the forms of a trial, but the defense is perfunctory on its face, and the client pays often for his poverty." (Goldman, The Public Defender 16, 18-20 (1917).)

The county and state public defender programs were created in response to this concern over the shoddy quality of legal services donated to indigent criminal defendants. (*Erwin* v. *Appellate Department* (1983) 146 Cal.App.3d 715 at p. 719 [194 Cal.Rptr. 328]; Cuff, *Public Defender System: The Los Angeles Story* (1961) 45 Minn. L.Rev. 715; see also Ervin, *Uncompensated Counsel: They Do Not Meet the Constitutional Mandate* (1963) 49 A.B.A. J. 435; Uelman, *Simmering on the "Backburner": The Challenge of Yarbrough* (1985) 19 Loyola L.A. L.Rev. 285, 291-299.

"Many of the proposals being considered to meet the challenge of providing counsel to indigent civil litigants have been tried before. We tend to forget that the system now in place for the representation of indigent *criminal* defendants was the product of years of struggle in trial-and-error fashion." (*Id.* at p. 290, original italics.)

To compel attorneys to provide representation without compensation in civil cases is to subvert the goal of providing qualified legal representation

to the poor in paternity cases. Here, petitioner Cunningham is not as sanguine about his ability to represent Mr. Martinez as the county is. If he does not possess the expertise to represent Mr. Martinez, he would place Mr. Martinez at a great disadvantage, and would thereby thwart the goals of the *Salas* case.

Even when an attorney with the requisite experience is drafted to provide free services to an indigent, will he be able to provide the same attention normally provided to a paying client? We would hope that every attorney would derive satisfaction from a job done well, but it may be unrealistic to expect the satisfaction which arises from performing a charitable act to constitute the sole motivation to expend maximum effort.

The more conscientiously the attorney fights for the indigent's cause, the greater the chance of the attorney's financial loss. There is the burden of costs of litigation such as payment for services rendered by investigators, expert witnesses, and court reporters to take depositions. The attorney may also be distracted by concerns over unfinished business at the office on the one hand, and the possible contempt citation hovering in the background on the other.

"An attorney owes an obligation not only to his client but also to the courts and the justice system not to undertake legal representation in matters unless he has adequate time to pursue the matter with reasonable diligence. When an attorney takes on more than he can properly handle, he jeopardizes both his client's cause and the public interest in sound and efficient administration of justice." (*Lopez* v. *Larson* (1979) 91 Cal.App.3d 383, 400 [153 Cal.Rptr. 912].)

Some attorneys may find shortcuts particularly seductive. In a close case, some may encourage an indigent defendant to stipulate to judgment, to avoid the cost and time involved in a full trial. This may occur not because the attorney has an improper motive, but because he may feel it too onerous to proceed with discovery and a full-scale trial in a case that has a limited chance of success. On the other hand, an attorney may feel compelled to go through a full-scale trial in a marginal case for fear of being accused of giving less than 100 percent effort to the indigent defendant. In either event, the indigent suffers.

The acceptance of a client by a lawyer involves a complex set of personal and professional judgments. (Uelman, *Simmering on the "Backburner":* *The Challenge of Yarbrough, supra,* 19 Loyola L.A. L.Rev. 285, 304-305.) Included in this calculus is the attorney's evaluation of whether he or she harbors any feeling of repugnance for the client. (Rule 6.2(c), ABA Model

Rules of Prof. Conduct.) Mandatory pro bono representation prevents an attorney from making a determination as to whom he or she wishes to represent. The conscripted attorney may provide representation out of fear of the consequences of refusal, rather than because of a belief that the client's case has merit. It has been observed, "[t]he quality of the uncompensated service can be expected to decrease in almost direct proportion to the loss of choice of the professional in rendering the service." (*State* ex rel. *Roper* v. *Scott, supra,* 688 S.W.2d at p. 768.)[10]

## CONCLUSION

The order appointing petitioner as counsel for Martinez is found to violate petitioner's right to equal protection of law. "An order of contempt cannot stand if the underlying order is invalid. [Citation]" (*In re Misener* (1985) 38 Cal.3d 543, 558 [213 Cal.Rptr. 569, 698 P.2d 637].)

We assume the county will move the court either to dismiss the action without prejudice, if appropriate, or to stay the action until the appointment of counsel in a manner consistent with the views expressed in this opinion. Should plaintiff fail to so move, we leave to the discretion of the trial court whether to dismiss the action without prejudice on its own motion.

The court in *County of Tulare* v. *Ybarra, supra,* 143 Cal.App.3d at page 585, concluded that there is no authority for a trial court to dismiss a state-instituted paternity action where the alleged father claims indigency and no public funds are available to pay for appointed counsel. Here, where conflicting constitutional issues clash, dismissal may be necessary. The inherent powers granted to the trial court by section 128 of the Code of Civil Procedure includes the authority to "control its process and orders so as to make them conformable to law and justice." This provision empowers the trial court to dismiss when appropriate.

Important rights of both children and the state are involved in the prosecution of paternity actions. (*Salas* v. *Cortez, supra,* 24 Cal.3d at pp. 33-34.) We do not wish to erect insuperable barriers to the prosecution of these actions, even though it is unlikely that indigent defendants will immediately be able to pay child support. Nonetheless, lawsuits, whether criminal or civil, are subject to constitutional considerations.

Under the Social Security Act, federal funding is not available to compensate counsel appointed to represent indigent defendants in paternity cases brought by the state. (45 C.F.R. § 304.20(b)(2) (1982).) Our holding does

---

[10]Additional problems develop when the appointed counsel believes that the indigent's claim is unworthy, and the indigent client thinks otherwise. (See *Bradshaw* v. *District Court* (9th Cir. 1984) 742 F.2d 515.)

not render the state's enforcement of child support ineffective so as to deprive it of federal funds for aid to families with dependent children. Nor does it place state initiated paternity actions against indigent defendants in a condition of permanent suspension.

Presumably state agencies will continue to diligently enforce these actions against non-indigent defendants. The Legislature has the power to enact appropriate legislation to allow paternity actions against indigents to go forward. It can simply appropriate funds to pay private counsel.[11] Such a funding scheme would not run afoul of federal regulations, and therefore would not jeopardize the state from receiving federal funding.

Let a writ of certiorari issue compelling respondent superior court to vacate its order of February 3, 1984, appointing Cunningham as counsel for Martinez and to vacate its order of March 28, 1984, finding petitioner to be in contempt of court. Let said writ further provide that respondent court is ordered to appoint qualified counsel who is willing to represent Martinez without compensation within 30 days after the finality of this opinion. If the court is unsuccessful in so appointing counsel, the court may not proceed with the action unless the county or state provides reasonable compensation for appointed counsel for Martinez.

Stone, P. J., and Abbe, J., concurred.

A petition for a rehearing was denied March 5, 1986, and the opinion was modified to read as printed above. The petition of real party in interest County of Ventura for review by the Supreme Court was denied May 8, 1986.

---

[11]This is hardly a novel suggestion. On the local level, for example, funds are available for private counsel to represent indigent criminal defendants in cases where the public defender has a conflict. (See Pen. Code, § 987.2.)