Filed 2/15/23  Smith v. Baniga CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| GREGORY SMITH,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>U. BANIGA et al.,<br><br>Defendants and Respondents. | F083046<br><br>(Super. Ct. No. 13CECG03237)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  D. Tyler Tharpe, Judge.

Gregory Smith, in pro. per., for Plaintiff and Appellant.

Rob Bonta, Attorney General, Monica N. Anderson, Assistant Attorney General, Neah Huynh and Oliver C. Wu, Deputy Attorneys General, for Defendants and Respondents.

-ooOoo-

The first appeal in this prisoner medical malpractice action addressed the denial of plaintiff Gregory Smith's motion for appointment of counsel or a medical expert and the grant of summary judgment for a doctor and nurse practitioner employed by the Pleasant Valley State Prison (Pleasant Valley).  (*Smith v. Ogbuehi* (2019) 38 Cal.App.5th 453, 478

(*Smith*).) The trial court's denial of Smith's motion for appointment was based on a misunderstanding of its authority to appoint counsel or an expert for an indigent prisoner pursuing a civil action. (*Id*. at p. 458.) As a result, we remanded "the matter to the trial court for an exercise of its discretionary authority within the framework of the three-step inquiry" adopted in *Apollo v. Gyaami* (2008) 167 Cal.App.4th 1468, 1485–1487 (*Apollo*) and *Wantuch v. Davis* (1995) 32 Cal.App.4th 786, 792 (*Wantuch*). (*Smith*, *supra*, at p. 458.)

After remittitur, the trial court obtained supplemental briefing from the parties, held a hearing, and again denied Smith's motion for the appointment of counsel or a medical expert. The court determined that (1) Smith was an indigent prisoner, (2) Smith's lawsuit did not involve a bona fide threat to his personal or property interests, and (3) his right of meaningful access to the courts had not been impeded. As explained below, we conclude the trial court did not abuse its discretionary authority in denying Smith's motion.

We therefore affirm the judgment.

## FACTS

### *Parties*

In 2004, Smith began serving a sentence of 39 years to life, with eligibility for parole. This lawsuit arises from medical care Smith received at Pleasant Valley after arriving there from the Richard J. Donovan Correctional Facility in San Diego County (Donovan) in August 2011 and before being transferred to Folsom State Prison (Folsom) in December 2013.

The defendants named in Smith's pleading were P. Brazelton, warden of Pleasant Valley; Dr. U. Baniga; Nurse Practitioner Ifeoma Ogbuehi; J. Clark Kelso, the federally appointed receiver; Dr. A. Duenas; and L. Zamora. Only Dr. Baniga, Ogbuehi, and Warden Brazelton were served with Smith's amended complaint. Subsequently,

Brazelton was dismissed with prejudice and, therefore, this lawsuit has been narrowed to claims against Dr. Baniga and Ogbuehi.

*Prison Health Care Crisis*

Part of the background relevant to Smith's medical malpractice claims is provided by a federal lawsuit, pending for most of this century, that addresses the adequacy of health care in prisons operated by the California Department of Corrections and Rehabilitation (CDCR). A stipulation filed in the federal lawsuit is relevant to Smith's time at Pleasant Valley because the stipulation created procedures that Smith and the Prison Law Office used to raise issues about the medical care Smith was receiving.[1]

The federal action began in April 2001 when a group of inmates "filed a class action in the United States District Court for the Northern District of California, entitled *Plata v. Davis*, No. 3:01–cv–01351–TEH (*Plata*)." (*In re Ilasa* (2016) 3 Cal.App.5th 489, 493.) The inmates "raised federal constitutional and statutory claims based on alleged inadequacies in the delivery of … medical care (*Plata*) to inmates in the California adult prison system." (*Ibid.*)

In June 2002, a stipulated judgment ordered the defendants in *Plata* "to implement new policies and procedures on a staggered basis, with seven prisons to complete implementation in 2003, and five additional prisons for each succeeding year until state-wide completion is achieved." (*Plata v. Schwarzenegger* (N.D. Cal., May 10, 2005, No. C01-1351 THE) 2005 WL 2932243, at *2.) But by May 2005, "not a single prison ha[d] successfully completed implementation." (*Ibid.*) The district court referred to "the crisis in the delivery of health care in the [CDCR]" and the underlying "problem of a highly

---

[1]    In *In re Estevez* (2008) 165 Cal.App.4th 1445, this court referred to the inmate's documents that included "correspondence with the Prison Law Office (class counsel in *Plata*), which made inquiries on his behalf but ultimately was unable to take action." (*Id.* at p. 1451.) In that case, the inmate had filed a petition for writ of habeas corpus with this court alleging he was being denied adequate medical treatment. (*Ibid.*)

dysfunctional, largely decrepit, overly bureaucratic, and politically driven prison system, … too far gone to be corrected by conventional methods." (*Id*. at \*1.) The district court issued an order to show cause as to why a receiver should not be appointed to manage health care delivery for the CDCR and why defendants should not be held in contempt of the court's prior orders. (*Id*. at \*11.)

In 2005, after six days of evidentiary hearings, "the district court issued findings detailing a long history of constitutional violations and a failure of California to comply with remedial orders. California admitted that it was unable to comply with the injunctive relief to which it had stipulated." (*Plata v. Schwarzenegger* (9th Cir. 2009) 560 F.3d 976, 979.)

"In February 2006, the district court issued an order appointing a Receiver and conferring upon the Receiver all of the powers of the Secretary of the CDCR with respect to the delivery of medical care, while concurrently suspending the Secretary's exercise of the same. Notwithstanding the 'unprecedented ... scope and dimension' of the receivership, as noted by the [district] court, the State neither objected to nor appealed the order [citation]." (*Plata v. Schwarzenegger* (9th Cir. 2010) 603 F.3d 1088, 1092.) The receiver was appointed "to 'provide leadership and executive management of the California prison medical health care delivery system with the goals of restructuring day-to-day operations and developing, implementing, and validating a new, sustainable system that provides constitutionally adequate medical care to all class members as soon as practicable.' " (*In re Estevez*, *supra*, 165 Cal.App.4th at p. 1450.)[2]

In January 2008, the district court removed the original receiver and appointed J. Clark Kelso (a named, but unserved, defendant in this action). (See Wilbur, *Chapter 22: Another Step Toward Curing Constitutional Deficiencies in California's Prisons* (2011)

---

[2] Also in 2006, Governor Schwarzenegger declared a state of emergency in California's prisons due to the severe overcrowding. (*Brown v. Plata* (2011) 563 U.S. 493, 503.)

4.

42 McGeorge L.Rev. 612, 613, fn. 17.)  In June 2008, Kelso—a law professor and veteran of state government—obtained the district court's approval of a turnaround plan of action.  (*An Update on the California Prison Crisis and Other Developments in State Corrections Policy* (2009) 14 Berkeley J. Crim. L. 143, 150–151.)

In August 2009, a three-judge panel determined "the medical and mental health care available to inmates in the California prison system is woefully and constitutionally inadequate, and has been for more than a decade." (*Coleman v. Schwarzenegger* (E.D. Cal. 2009) 922 F.Supp.2d 882, 887.)  The panel found that California's prisoners "are forced to wait months or years for medically necessary appointments and examinations, and many receive inadequate medical care in substandard facilities that lack the medical equipment required to conduct routine examinations or afford essential medical treatment." (*Id*. at pp. 887–888.)  To remedy these violations, the panel ordered the CDCR to reduce the population of its adult institutions to 137.5 percent of their design capacity within two years.  (*Id*. at pp. 1003–1004.)  In May 2011, about three months before Smith arrived at Pleasant Valley, the United States Supreme Court affirmed the panel's decision, noting California's "prisons had operated at around 200% of design capacity for at least 11 years." (*Brown v. Plata*, *supra*, 563 U.S. at pp. 502, 545.)

The three-judge panel "subsequently extended the deadline to December 2013," which is the month Smith was transferred from Pleasant Valley to Folsom.  (*Plata v. Newsom* (N.D.Cal. 2020) 445 F.Supp.3d 557, 560.)  Later, the panel extended the deadline to February 2016.  (*Ibid*.)  In 2015—after the time relevant to this lawsuit— California "succeeded, for the first time, in reducing the statewide prison population to less than 137.5% design capacity.  The population has remained below that benchmark ever since." (*Coleman v. Newsom* (E.D.Cal. 2020) 455 F.Supp.3d 926, 930.)  Nonetheless, problems with providing medical care to inmates still exist, the federal class

action remains pending, and the "Fiftieth Tri-Annual Report of the Federal Receiver" was filed on June 1, 2022.[3]

More recent developments are not described here because the foregoing summary covers the period Smith spent at Pleasant Valley. One of the stipulations entered in *Plata* created a way for Smith and other prisoners to raise concerns about their medical care. (See pt. II.A.1., *post*.)

*Smith's Medical Conditions*

Before Smith's arrival at Pleasant Valley, he was injured in two separate cellmate assaults. After the first cellmate assault, medical staff at Donovan coordinated two surgeries on Smith's right thumb and wrist in 2008 and 2009. Donovan medical staff also prescribed gabapentin for pain.

In June 2010, Smith experienced a sudden onset of right knee pain. Donovan medical staff identified a lateral meniscus tear and preliminarily evaluated Smith for surgery.

In September 2010, the second cellmate assault occurred, injuring Smith's left shoulder. Donovan medical staff and Smith prioritized treatment of the injured shoulder over the treatment of Smith's knee. In September 2010, the first surgery on Smith's left shoulder was conducted. In February 2011, Donovan medical staff coordinated a second surgery on Smith's shoulder to remove the displaced anchor. Donovan medical staff also prescribed morphine for pain.

While treating Smith's shoulder, a CT scan revealed an old compression fracture of Smith's L3 vertebrae. Smith was given a back brace, but no significant treatment was provided for his back. To summarize, while at Donovan, Smith experienced medical

---

[3]     Recent reports are available on a web site maintained by the California Correctional Health Care Services. (<https://cchcs.ca.gov/archived_tri_annuals/> [as of Jan. 18, 2023].)

problems with his right hand, right knee, left shoulder, and his spine and his symptoms included pain.

*Medical Treatment at Pleasant Valley*

On September 6, 2011, Smith met with Pleasant Valley medical staff for an intake evaluation. The medical records reflect Smith was evaluated and medical staff noted his chronic shoulder pain, continued his pain medication, and scheduled a further evaluation by a primary care provider. Later in September, Smith met with a physical therapist for an evaluation of his shoulder, received a recommendation of physical therapy once a week, and had five sessions for shoulder therapy.

Ogbuehi first met with Smith in October 2011 for a primary care evaluation. Smith was provided an initial pain assessment form on which he specified he was suffering from pain in his left shoulder, lower back and right knee. A week later, Smith again met with Ogbuehi and completed a chronic pain intake sheet described in more detail in part II.A.3. of this opinion.

It appears the first significant involvement Dr. Baniga had with Smith's medical care occurred on January 11, 2012, when Dr. Baniga was a member of the clinical case management review committee that assessed Smith's condition and recommended his left shoulder should be evaluated by an orthopedic surgeon.

Details about the treatment of Smith's pain, left shoulder, right knee, back and neck are set forth later in this opinion.

**PROCEEDINGS**

Smith has represented himself while exhausting administrative remedies, filing a claim under the Government Claims Act (Gov. Code, § 810 et seq.), and pursuing this litigation. (*Smith, supra,* 38 Cal.App.5th at p. 460.) In October 2013, Smith filed a civil complaint and an application for waiver of court fees. In April 2014, after various motions had been filed and some withdrawn, Smith filed an amended complaint asserting three causes of action for medical malpractice.

7.

Smith alleged defendants breached their legal duty to provide reasonable and competent medical care by failing to give necessary medication; prescribing inappropriate medication; delaying examination and treatment; and failing to provide access to a specialist that his particular condition required. The pain being treated related to Smith's shoulder injury, a compression fracture of his L3 vertebrae, and a tear of the lateral meniscus in his right knee.

Smith also alleged the "failure to summon immediate medical care … is serious enough [to] amount to the wanton and unnecessary infliction of pain and suffering." He alleged his shoulder cannot be repaired due to delays in treatment; the morphine he was taking for pain was inappropriately lowered and then withdrawn completely; the gabapentin he was taking was inappropriately withdrawn; and Dr. Baniga refused his request to be removed from Ogbuehi's care and assigned another nurse practitioner.

*Motion for Appointment of Counsel*

In April 2015, after Dr. Baniga and Ogbuehi had been served and filed an answer, Smith filed a motion for appointment of counsel. The motion asserted Smith was unable to afford counsel; the issues involved in the case were complex and would require medical expert testimony; Smith had little or no access to drug manufacturers and their data, specialists of the spine, or the Food and Drug Administration; and Smith had limited knowledge of the law.

In May 2015, the trial court issued an order (1) stating it had received Smith's ex parte motion for appointment of counsel, (2) mentioning the right to appointed counsel in criminal cases and lack of authority to appoint counsel for a plaintiff in a civil proceeding, (3) stating Smith had "failed to provide any authority that would support the request that this court appoint an attorney in this civil action," (4) concluding it was "without authority to appoint an attorney in this case," and (5) denying the request.

*Motion for Summary Judgment*

In December 2016, defendants filed a motion for summary judgment, which is relevant to Smith's motion for the appointment of counsel or a medical expert and "whether the lawsuit involves a bona fide threat to [Smith's] personal or property interests." (*Smith, supra*, 38 Cal.App.5th at p. 458.) Defendants' summary judgment motion asserted "the undisputed material facts establish that Nurse Practitioner Ogbuehi and Dr. Baniga's provision of medical services to [Smith] did not fall below the standard of care." The separate statement of undisputed material facts was organized into 10 sections that addressed plaintiff's (1) shoulder condition, (2) back condition, (3) knee condition, (4) morphine prescription, (5) gabapentin prescription, (6) oxcarbazepine prescription, (7) amitriptyline claims, (8) request for a new provider, (9) causal link, and (10) the lawsuit. The motion was supported by declarations of a medical expert and a deputy attorney general. Ogbuehi and Dr. Baniga did not submit declarations to support their motion for summary judgment.

The medical expert relied upon by defendants was Dr. A. Duenas. Dr. Duenas was a named but unserved defendant who had been dismissed without prejudice in 2015. Dr. Duenas began working for the CDCR in 2008 and remained in its employ through the date of her declaration. She was the chief physician and surgeon at Pleasant Valley when Smith arrived and continued in that role until February 2012, when she transferred to another institution.

Dr. Duenas's opinion on the adequacy of medical care provided to Smith by Dr. Baniga and Ogbuehi was based on (1) her review of medical records of the care provided to Smith during his incarceration from 2004 through the date of her declaration; (2) her direct participation in Smith's case while chairing the clinical case management review committee, which evaluated Smith on January 11, 2012; (3) the administrative grievance filed by Smith relating to care given by Ogbuehi, which Dr. Duenas granted in part at the second level of review and initiated a confidential staff inquiry; (4) her review of

9.

nonmedical records provided by defense counsel and included in the papers supporting the motion for summary judgment; and (5) her professional experience, training, and knowledge. Dr. Duenas's declaration set forth her "professional opinion that Ogbuehi and Dr. Baniga's medical practices met applicable standards of care. Further, it is my professional opinion, to a degree of medical probability, that no action or inaction by Nurse Practitioner Ogbuehi or Dr. Baniga caused plaintiffs claimed harm." These opinions were supported by the details set forth and analyzed in paragraphs 14 through 93, inclusive, of her declaration, which covered approximately 25 pages.

On April 27, 2017, Smith filed a response to defendants' separate statement of undisputed material facts, which included exhibits totaling over 120 pages.[4] The hearing on the summary judgment motion was held on April 27, 2017, and the trial court adopted its tentative ruling to grant the motion. The ruling stated defendant had met their burden by showing that nothing Ogbuehi or Baniga did caused Smith's harm. The court referred to Dr. Duenas's opinion that defendants' medical practices met the applicable standards of care and stated the medical records showed that Dr. Baniga did not refuse Smith's request to be assigned to a different medical provider.

In May 2017, the trial court entered a judgment in favor of Ogbuehi and Dr. Baniga in the amount of $1,330.13 and decreed that Smith would take nothing. Smith filed a timely appeal.

---

[4] The tentative ruling on the motion for summary judgment was issued on April 11, 2017, so the trial court did not have the benefit of Smith's response when it made its tentative decision, which was later adopted on April 27, 2017, following an unreported hearing held that day. The record does not show whether the trial court had actually seen Smith's response before or during the hearing.

In *Smith*, *supra*, 38 Cal.App.5th 453, this court reversed the judgment and remanded for further proceedings on Smith's motion to appoint counsel or a medical expert. (*Id*. at p. 478.)[5] Remittitur was issued in October 2019.

*Proceedings After Remand*

In December 2020, the trial court issued an order setting a schedule for supplemental briefing of Smith's motion. Smith's opening brief and defendants' opposition were filed February 2021. On April 7, 2021, the trial court held a hearing and took the matter under submission.

In May 2021, the trial court filed an order denying Smith's motion for appointment of counsel and appointment of an expert, reactivating defendants' motion for summary judgment, and granting the motion for summary judgment. Smith appealed. After defendants filed their respondents' brief in April 2022, Smith did not file an appellant's reply brief. The absence of a reply brief is not construed as an abandonment of the appeal or an admission the appeal lacks merit.[6]

---

[5]     Similar results have been reached in federal cases. (E.g., *Gillentine v. Correctional Medical Services* (11th Cir. 2014) 556 Fed.Appx. 845, 847 [summary judgment vacated; remanded for district court to consider Alabama prisoner's motion for appointment of medical expert and then exercise its discretion]; *Spann v. Roper* (8th Cir. 2006) 453 F.3d 1007, 1009 [summary judgment reversed in part; appellate court found "it incongruous that the district court denied Spann's motion for an expert witness and then granted summary judgment in part based on Spann's failure to provide verifying medical evidence"]; *Steele v. Shah* (11th Cir. 1996) 87 F.3d 1266, 1271 [summary judgment on inmate's claim of deliberate indifference to serious medical need reversed; remanded for district court to exercise its discretion on inmate's requests for appointment of medical expert and appointment of counsel]; see *Born v. Monmouth County Correctional Institution* (3rd Cir. 2012) 458 Fed.Appx. 193, 197 ["some courts have held that [Federal] Rule [of Evidence] 706 can be used to appoint an expert for an indigent civil litigant and apportion the costs of such expert to the other side"]; see generally, Wiseman, *Pro Bono Publico: The Growing Need for Expert Aid* (2008) 60 S.C. L.Rev. 493.)

[6]     The California Appellate Courts Self-Help Resource Center states that an "appellant can choose to file a reply brief but it is not required." (<https://selfhelp.appellate.courts.ca.gov/appeals-timeline/reply-brief/> [as of Jan. 18, 2023]; see *Ellerbee v. County of Los Angeles* (2010) 187 Cal.App.4th 1206, 1218, fn. 4

**DISCUSSION**

I.      BACKGROUND

      A.      <u>Discretionary Determinations Remanded to the Trial Court</u>

In *Smith*, we provided an overview of indigent prisoner's right of access to the courts, which is based on California statute (Pen. Code, § 2601, subd. (d)) and the state and federal constitutions.  (*Smith*, *supra*, 38 Cal.App.5th at pp. 465–470.)  That overview need not be repeated in this unpublished opinion.

This appeal involves Smith's right of meaningful access to the courts, which is the source of the trial court's discretionary authority to appoint counsel or a medical expert. In the first appeal, we concluded "that the trial court was not aware of its discretionary authority and, as a result, did not exercise that discretion."  (*Smith*, *supra*, 38 Cal.App.5th at p. 476.)  Accordingly, we reversed the judgment and remanded "for further proceedings in which the trial court is directed to 'first determine whether appellant is indigent' and next determine whether the lawsuit involved a bona fide threat to his personal or property interests.  (*Apollo*, *supra*, 167 Cal.App.4th at p. 1485.)  If those two conditions are present, the trial court must consider what remedies are available to protect Smith's right to meaningful access to the court, which remedies include the appointment of counsel and the appointment of an expert under Evidence Code section 730."  (*Smith*, *supra*, at p. 477.)[7]

---

[failing to file a reply brief is not an admission].)  Thus, case law predating the adoption of the California Rules of Court and stating the failure to file an appellant's reply brief "concedes that respondent's position is unassailable" (*Johnson v. English* (1931) 113 Cal.App. 676, 677) is no longer good law.

[7]     The term "bona fide threat" is derived from language used in *Payne v. Superior Court* (1976) 17 Cal.3d 908 (*Payne*).  There, the California Supreme Court concluded that, under the state and federal constitutions, an indigent prisoner who is a *defendant* in "a bona fide legal action threatening his interests" is entitled to access to the courts to present a defense.  (*Payne*, at p. 924.)  In *Yarbrough v. Superior Court* (1985) 39 Cal.3d 197 (*Yarbrough*), the court twice quoted the phrase "a bona fide legal action threatening his interests" and reaffirmed its conclusion that, in certain situations, the appointment of

We also concluded (1) the determination of whether an inmate's meaningful access to the courts was impeded is committed to the trial court's discretion; (2) the issue of impeded access is intertwined with the issue of the appropriate remedy or remedies to secure meaningful access because the resolution of each issue often involves an evaluation of the same facts and circumstances; and (3) a trial court must examine the totality of the circumstances when making the discretionary determination of whether an inmate's access is being impeded. (*Smith*, *supra*, 38 Cal.App.5th at p. 470)

### B. Standard of Review

Initially, we note that the legal conclusions reached in *Smith* are binding in this appeal under California's doctrine of law of the case. Neither party contends otherwise. "The law of the case doctrine states that when, in deciding an appeal, an appellate court 'states in its opinion a principle or rule of law necessary to the decision, that principle or rule becomes the law of the case and must be adhered to throughout its subsequent progress, both in the lower court and upon subsequent appeal ….' " (*Kowis v. Howard* (1992) 3 Cal.4th 888, 892–893.)

---

counsel may be the only way to provide an incarcerated, indigent civil defendant with access to the court to protect threatened personal and property interests. (*Id*. at pp. 200–201, 203–204.)

In *Wantuch, supra,* 32 Cal.App.4th 786, the Second District cited *Payne* and *Yarbrough*, extended the right of meaningful access to the civil courts to an indigent prisoner who was a *plaintiff* pursuing a legal malpractice action against his former criminal defense attorney, and remanded to the trial court to determine whether the prisoner was "a party to a bona fide civil action threatening his or her personal or property interests." (*Wantuch*, at pp. 792, 796.) Since *Wantuch*, other published decisions involving *plaintiff* prisoners have adopted the legal standard of a "bona fide civil action threatening" the prisoner's personal or property interests even though our Supreme Court formulated that standard for incarcerated *defendants*. (See *Crane v. Dolihite* (2021) 70 Cal.App.5th 772, 783 [personal injury action against another inmate; Fifth Dist.] (*Crane*); *Hulbert v. Cross* (2021) 65 Cal.App.5th 405, 413 [medical malpractice action; Third Dist.]; *Apollo, supra,* 167 Cal.App.4th at p. 1482 [medical malpractice action; Second Dist.].)

13.

Accordingly, this opinion adheres to the principles in part I.A., *ante*, that govern an indigent inmate's right of meaningful access and, more particularly, motions by such an inmate for the appointment of counsel or an expert. Those principles identify determinations that are committed to the trial court's discretion. It follows that we review those trial court determinations under the abuse of discretion standard of appellate review.

"The abuse of discretion standard is not a unified standard; the deference it calls for varies according to the aspect of a trial court's ruling under review. The trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious." (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711–712, fns. omitted; see *County of Kern v. T.C.E.F., Inc.* (2016) 246 Cal.App.4th 301, 316 [abuse of discretion standard does not allow trial courts to apply incorrect rule of law or make factual findings that are not supported by substantial evidence].) In its first ruling on Smith's motion, the trial court did not apply the correct rule of law and, thus, abused its discretion. (*Smith*, *supra*, 38 Cal.App.5th 475 [trial court "committed legal error in concluding it was without the authority to appoint counsel"].)

C.     The Issue Presented:  Are Smith's Claims "Bona Fide"?

Two of the issues remanded to the trial court were whether Smith was indigent and whether his claim was bona fide. (See *Smith*, *supra*, 38 Cal.App.5th at p. 477 [those two issues were "better left to the trial court in the first instance"].) The trial court concluded that Smith was indigent and his "lawsuit is not bona fide." In this appeal, the indigency finding is not contested and, therefore, we consider whether trial court abused its discretion in determining Smith's lawsuit was not bona fide.

Smith contends his medical malpractice lawsuit is bona fide because (1) it was brought in good faith without fraud or deceit,[8] (2) it seeks relief for nontrivial injuries that the medical reports and other records show are serious to severe in nature, (3) defendants' lack of due care presents a question of fact that should be decided by the jury, and (4) the evidence supports the existence of both bona fide injuries and bona fide claims for relief. Smith's reference to bona fide injuries and bona fide claims implies that the existence of a "bona fide threat to his personal or property interests" (*Smith*, *supra*, 38 Cal.App.5th at p. 477) requires an evaluation of both the injuries for which relief is sought and the merits of the claim—that is, the likelihood of obtaining relief for the injuries alleged.

Defendants contend the trial court correctly determined Smith's claims were not bona fide because Smith failed to make a threshold showing of merit. Based on California Supreme Court cases involving indigent prisoners who were *defendants* in civil actions, defendants contend indigent prisoners who are plaintiffs in a civil action must demonstrate their interests "are actually at stake in the suit" (*Payne*, *supra*, 17 Cal.3d at p. 924) and not "wholly ephemeral" (*Yarbrough*, *supra*, 39 Cal.3d at p. 205). In defendants' view, *Yarbrough*'s actually-at-stake standard requires more than a nontrivial injury and courts must objectively assess both the purported injuries and the potential for recovery to ensure that the incarcerated plaintiff's expectation for relief is not too remote. Defendants contend the appointment of counsel is appropriate only in cases where the inmate has demonstrated "facial plausibility" and made "a threshold factual showing of entitlement to relief."

Defendants summarize their approach by stating: "Incarcerated plaintiffs must demonstrate some likelihood of success or a threshold factual showing that there may be

---

**8** Smith relies on definitions in three dictionaries. One defines "bona fide" as "**1.** Made in good faith; without fraud or deceit. **2.** Sincere; genuine." (Black's Law Dictionary (8th ed. 2004) p. 186.)

15.

a basis for relief." Defendants argue that when this approach is applied to the record, Smith's motion fails because he has presented no evidence raising his entitlement to relief above the speculative level.

Consistent with the parties' contentions, we conclude that an indigent prisoner's claims are bona fide when (1) the claim seeks relief for an actual, nontrivial injury to the prisoner's personal or property interests and (2) there is an objective showing of sufficient merit—that is, there is a reasonable probability of prevailing on the claim and obtaining relief for the injury suffered.

An example of a bona fide threat to an inmate's personal interests is provided by the medical malpractice claim pursued by the plaintiff in *Hulbert v. Cross*, *supra*, 65 Cal.App.5th 405. There, the inmate alleged the doctor who performed surgery on his elbow failed to tighten a screw in an implant and the screw came loose and damaged the elbow joint, cartilage, and surrounding tissue. (*Id*. at p. 409.) The trial court found the inmate had a bona fide medical malpractice claim and the appellate court accepted that determination. (*Id*. at pp. 412, 416.) Another example is provided by *Crane*, where the plaintiff's personal injury lawsuit against another inmate was bona fide because he sought "relief for nontrivial injuries resulting from being stabbed in the neck" and the requisite merit was demonstrated by the other inmate pleading guilty to the felony of assault with a deadly weapon. (*Crane*, *supra*, 70 Cal.App.5th at pp. 788–789, 793; see Evid. Code, § 1300 [use of felony conviction to prove facts in a civil action].)

II.     MERITS OF SMITH'S MALPRACTICE CLAIMS

"The elements of a cause of action for medical malpractice are: (1) a duty to use such skill, prudence, and diligence as other members of the profession commonly possess and exercise; (2) a breach of the duty; (3) a proximate causal connection between the negligent conduct and the injury; and (4) resulting loss or damage." (*Johnson v. Superior*

16.

*Court* (2006) 143 Cal.App.4th 297, 305.)[9]  These elements provide the foundation for our analysis of whether Smith's various claims of malpractice have sufficient merit that the trial court abused its discretion in determining they were not bona fide.

A.    Pain Medication

One type of malpractice claim asserted by Smith is that defendants mishandled his pain medication.  He alleges (1) his morphine was inappropriately reduced, (2) his gabapentin was inappropriately withdrawn, (3) he was inappropriately prescribed oxcarbazepine, and (4) he was inappropriately prescribed amitriptyline.

1.    *Morphine—First Tapering*

In September 2010, while Smith was at Donovan, his left shoulder was injured in a cellmate assault.  Donovan medical staff and Smith prioritized treatment of the injured shoulder over the treatment of Smith's knee, and the first shoulder surgery was performed that month.  In February 2011, Donovan medical staff coordinated a second surgery on Smith's shoulder to remove the displaced anchor.  A medical record related to the second surgery refers to a prescription for pain medications and includes the recommendations to "wean pain meds" and to follow-up in six to eight weeks.

Before Smith's August 2011 transfer to Pleasant Valley, his morphine dosage was increased to 30 milligrams (mg) three times per day.  Initially, this morphine dosage was continued at Pleasant Valley.

---

[9]    "The first element, standard of care, is the key issue in a malpractice action and can only be proved by expert testimony, unless the circumstances are such that the required conduct is within the layperson's common knowledge." (*Lattimore v. Dickey* (2015) 239 Cal.App.4th 959, 968.)  The standard of care applied to nurses is not the same as that applied to physicians or surgeons; instead, the standard is measured by that of other nurses in the same or similar locality and under similar circumstances. (*Id*. at p. 969.)  As with doctors, expert opinion testimony is required to prove a defendant nurse breached the standard of care, except in cases where the negligence is obvious to laypersons. (*Ibid*.)

In September 2011, Smith's noon morphine dosage was changed from 30 mg of extended release morphine to 30 mg of instant release morphine. In October 2011, Ogbuehi met with Smith. She completed a chronic pain intake sheet stating Smith's pain was "mainly" in his shoulder and continued his morphine dosage.

On December 5, 2011, Smith met with Ogbuehi for a chronic care follow-up evaluation. The record from that visit stated Smith wanted to make sure his morphine prescription did not expire and that he got angry and left when told of the plan to taper his pain medication. Smith asserts the visit was supposed to be a follow-up and "[t]he follow-up was only physical therapy and pain medication." Defendants assert the records show Ogbuehi continued Smith's pain medication until the next chronic pain follow-up visit.

Later that December, the first taper schedule was implemented, and Smith's morphine prescription was reduced from 90 mg per day to 60 mg per day for seven days, then reduced to 45 mg per day for seven days, and then 30 mg per day. On December 21, 2011, Smith again met with Ogbuehi. Defendants assert the records indicate Smith refused an examination and Ogbuehi referred Smith to the clinical case management review committee. Smith asserts he "said to Nurse Practitioner Ogbuehi, if I am here to talk about medication and 'not' my chronic pain condition I am gone. I left. It was not about my knee, back, or shoulder."

In January 2012, the Prison Law Office received a letter from Smith about his pain medication. In accordance with procedures set forth in a stipulation entered in *Plata*, the Prison Law Office generated a memorandum dated January 30, 2012, addressed to "Chris Swanberg/Receiver's Office of Legal Affairs." The memorandum was sent to the Attorney General's Office and asked three questions about Smith's pain treatment. A February 9, 2012 memorandum from the California Correctional Health Care Services stated that, pursuant to the *Plata* stipulation, the chief medical executive at Pleasant Valley had provided responses to the questions. One response in the memorandum stated

18.

that "*Smith's morphine prescription was not discontinued; it was tapered down per his provider's recommendation*."  Another response stated the pain management committee had considered Smith's case on January 11, 2012, and decided to continue his morphine at a lower dose pending reevaluation of his shoulder by an orthopedic surgeon.  On January 20, 2012, Ogbuehi increased Smith's morphine from 30 mg per day to 75 mg per day.  This dosage was continued until after Smith's third shoulder surgery, which was performed in August 2012.

Dr. Duenas's declaration stated that several guidelines strongly recommend that all patients prescribed opiates be evaluated for discontinuation of such drugs and noted the effects and risks of long-term use of morphine, which include increased tolerance, physical and psychological dependence, constipation, drowsiness, fluid retention, respiratory suppression, and (paradoxically) an increased sensitivity to pain in some patients.  The declaration also stated that Ogbuehi acted appropriately and in accordance with the judgment of physicians at Donovan who had recommended tapering Smith's morphine prescription to a safer dose, and Ogbuehi never withdrew Smith's morphine but simply reduced it pending review by the pain management committee.

Based on the problems that can arise from extended use of morphine and the recommendation of the medical staff at Donovan to wean Smith from his pain medications, we conclude it is highly improbable that Ogbuehi breached the standard of care in the first tapering of Smith's morphine dosages.  (See *O'Brien v. Saha* (9th Cir. 2022) 2022 WL 16945892 [affirmed summary judgment for prison doctors; tapering inmate off his gabapentin and morphine prescription was done in accordance with California Correctional Health Care Services' guidance on the dangers posed by gabapentin and opioids].)  Consequently, the trial court did not abuse its discretion when it determined Smith's malpractice claim against Ogbuehi relating to the first tapering of his morphine lacked sufficient merit to be regarded as a bona fide claim.  (Cf. *Brennan v. Headley* (11th Cir. 2020) 807 Fed.Appx. 927, 937 [affirmed summary judgment for

prison doctor; decision to change inmate's pain-management regimen from opioids to nonopioids was a matter of medical judgment].)

We note that Smith's circumstances are distinguishable from cases where an inmate's pain medication is withdrawn without tapering. (See *Fierro v. Smith* (9th Cir. 2022) 39 F.4th 640 [jury instruction about deference to prison official's adoption and execution of policies and practice not appropriate in cases where inmates "challenged the sudden discontinuation of their pain medication, without tapering, by prison medical staff"]; *Coston v. Nangalama* (9th Cir. 2021) 13 F.4th 729, 735 [California inmate's morphine prescription terminated without tapering].)

### 2. Morphine—Second Tapering

In October 2012, after Smith's third shoulder surgery, he met with Ogbuehi for a follow-up evaluation. Ogbuehi proposed a second tapering schedule of 60 mg of morphine per day for seven days followed by 45 mg per day. The medical records reflect Smith was offered 60 mg of morphine per day from October 4, 2012, to October 9, 2012, and 45 mg per day from October 10, 2012, to September 6, 2013.

In February 2013, Smith met with the pain management committee, which recommended that he continue with 45 mg of morphine per day until an evaluation of nonshoulder pain sources could be evaluated. As recommended, Obguehi continued this dosage until September 6, 2013, when she increased it to 60 mg per day while Smith underwent physical therapy for his back.

After September 6, 2013, until Smith's December 2013 transfer to Folsom, his morphine prescription consisted of 15 mg of extended release morphine in the morning, 15 mg of instant release morphine at noon, and 30 mg of extended release morphine in the evening.

As with the first tapering of Smith's morphine prescription, we conclude the trial court did not abuse its discretion when it determined the malpractice claim relating to the

second tapering lacked sufficient merit to be regarded as a bona fide claim. Among other things, the decision to taper was consistent with guidance about the dangers of opioids. (See *O'Brien v. Saha*, *supra*, 2022 WL 16945892.)

   3.   *Gabapentin*

Gabapentin (Neurontin) is an anticonvulsant drug disfavored for pain treatment unless the pain has strong neuropathic qualities. Inmates have abused gabapentin or diverted it for sale to other inmates. To address these problems, California prisons administer gabapentin by pulverizing the tablet (or opening the capsule) and placing it in a cup of water.

Following two wrist surgeries at Donovan in 2008 and 2009, Smith was prescribed gabapentin for neuropathic pain in his right hand and wrist. On September 6, 2011, Smith met with Pleasant Valley medical staff for an intake evaluation. The record from the evaluation reflects that medical staff evaluated Smith's right wrist, noted the grip was "5/5" and his gross sensation was intact, continued the gabapentin prescription, and questioned whether gabapentin was still indicated.

On October 18, 2011, Ogbuehi met with Smith and provided him with an initial pain assessment form. In response to the form's question about the problems he would like help with, Smith indicated his left shoulder, lower back, and right knee. Ogbuehi's notes stated that Smith reported that morphine and gabapentin "help somewhat." Ogbuehi informed Smith that the gabapentin doses would be tapered because it was not indicated for his kind of pain.

On October 25, 2011, Ogbuehi met with Smith, evaluated him, and completed a chronic pain intake sheet that listed pain in his left shoulder and lower back with it mainly in the shoulder. Ogbuehi found no focal tenderness in Smith's right wrist and no positive Phalen's test. Ogbuehi again indicated the gabapentin dose would be tapered. On November 20, 2011, Smith's gabapentin prescription was discontinued. The record

of the clinical case management review committee's January 11, 2012 evaluation of Smith does not refer to his right wrist or associated pain, does not reflect Smith raised an issue relating to gabapentin, and states that, "[a]t some point, he was taking [gabapentin], but that was discontinued." The medications that Smith receives at Folsom include morphine and Tylenol, but do not include gabapentin.

Defendants assert that, from August 6, 2011, through November 20, 2011, Smith was offered gabapentin and the medical records suggest that he refused or otherwise failed to receive a number of gabapentin administrations during that time. Smith contends the missed doses were due to the gabapentin being offered in capsule form and he was unable to swallow the powder. He also contends a nurse practitioner requested tablets, but never got them. Dr. Duenas's declaration states that "Ogbuehi appropriately discontinued gabapentin in the absence of strong neuropathic pain in [Smith's] right wrist."

Because gabapentin is disfavored for treating pain without strong neuropathic qualities and Smith's complaints of neck, back and shoulder pain was not neuropathic, we conclude it is highly improbable that Ogbuehi breached the standard of care by discontinuing Smith's gabapentin doses. Consequently, the trial court did not abuse its discretion when it determined Smith's malpractice claim relating to the discontinuation of his gabapentin prescription lacked sufficient merit to be regarded as a bona fide claim. (See *Acosta v. Thomas* (2d Cir. 2020) 837 Fed.Appx. 32 [affirmed summary judgment for prison doctor who tapered inmate's gabapentin (Neurontin) dosage for pain notwithstanding inmate's disagreement with the decision to discontinue it].)

### 4. Amitriptyline

Causation and damages are the elements of a malpractice claim relevant to Smith's claims that he was inappropriately prescribed amitriptyline and oxcarbazepine.

Dr. Duenas's declaration states amitriptyline is a tricyclic antidepressant drug used to treat pain, with or without coexisting depression, and experts recommend amitriptyline to treat chronic pain in lieu of opiates or in combination with opiates. The declaration also states the medical records reflect that Ogbuehi proposed amitriptyline (Elavil) in chronic pain follow-up evaluations on January 9, 2013, July 30, 2013, and December 3, 2013, and Smith refused. Smith does not dispute this description of Ogbuehi's proposal and his refusal.

Dr. Duenas opined that Ogbuehi's proposal was reasonable and appropriate in the ongoing administration of Smith's medical care and, more importantly for purposes of this appeal, the proposal caused Smith no harm because he was never actually administered amitriptyline. We conclude that because Smith never took any amitriptyline, he will not be able to establish the elements of (1) damage or (2) a causal connection between the allegedly negligent proposal and an injury to him. Consequently, the malpractice claim relating to the proposed use of amitriptyline lacks sufficient merit to be regarded as a bona fide claim.

5.    *Oxcarbazepine*

Defendants assert that the medical records reflect that in December 2012, Ogbuehi added a dose of 150 mg of oxcarbazepine to the pain medication given Smith in the morning and that, over the course of 36 days, Smith refused the dose 12 times. In contrast, Smith's response to defendants' separate statement of undisputed facts asserts he did not take oxcarbazepine—"Never, Ever, did. Suspicious! Indeed."

We conclude that Smith's empathic assertion that he never took oxcarbazepine means he will not be able to prove the elements of damage or a causal connection between the Ogbuehi's proposal to administer oxcarbazepine and an injury to him. Consequently, the malpractice claim relating to the proposed use of oxcarbazepine lacks sufficient merit to be regarded as a bona fide claim.

23.

B.    Shoulder Condition

1.    *Malpractice Claim*

Smith alleges that a complete tear of a tendon in his left shoulder became unrepairable because of too much delay before his third surgery in August 2012. Smith's government claim form, which is attached to his amended complaint, refers to a delay in medical attention to his shoulder, objections to the orthopedic surgeon's recommendation, and negligent care in follow up with an orthopedic surgeon to correct the ongoing shoulder problem.

2.    *Background*

In September 2010 and February 2011, while Smith was at Donovan, the medical staff at University of California at San Diego (UCSD) performed two surgeries on Smith's left shoulder. In June 2011, Smith's shoulder was x-rayed and no significant changes were noted.

During Smith's September 2011 intake evaluation at Pleasant Valley, its medical staff noted Smith's chronic shoulder pain, continued his pain medications, and scheduled a further evaluation by a primary care provider. In September and October of 2011, Smith met with a physical therapist for an evaluation of his shoulder, received a recommendation of physical therapy once a week, and attended five such therapy sessions.

Ogbuehi first met with Smith in October 2011, while he was undergoing physical therapy for the shoulder. Based on her October 2011 evaluations, Ogbuehi continued Smith's physical therapy and, as described earlier, continued the morphine dosage prescribed at Donovan.

In December 2011, Ogbuehi referred Smith to the clinical case management review committee. On January 11, 2012, Smith met with the committee and it recommended reevaluation of Smith's shoulder by an orthopedic surgeon.

On February 10, 2012, Smith's shoulder was evaluated by Dr. Y. N. Paik of the Pacific Orthopedic Medical Group. Dr. Paik requested an x-ray and arthrogram and recommended passive range of motion exercises in the meantime. On May 4, 2012, after the x-ray and arthrogram were completed, Smith again met with Dr. Paik, who recommended arthroscopic joint debridement, excision of multiple loose bodies and sub-acromical decompression, and repair of the rotator cuff. Dr. Paik recommended continuing the exercises and pain medication. On August 1, 2012, Smith underwent arthroscopic joint debridement and sub-acrominal decompression to his left shoulder. Attempts to reattach his rotator cuff were unsuccessful. On August 20, 2012, Smith met with Dr. Paik, who opined that Smith was not a candidate for reattachment of the rotator cuff due to retraction and extensive tear. Dr. Paik recommended intensive exercise to build strength in the shoulder.

After the arthroscopic surgery to his shoulder, Smith underwent physical therapy and the pain in his left shoulder lessened. Medical records reflect Smith completed physical therapy for his shoulder in June 2013 and his pain had decreased. Records from a September 2016 evaluation of Smith at Folsom reflect Smith reporting intermittent morning stiffness in the shoulder, but his shoulder was not noted as one of his current conditions.

### 3. Analysis

Smith contends his tendon could have been repaired, he should have been a candidate for reattachment, and delays in treatment at Pleasant Valley caused the shoulder to become unrepairable. In response, defendants assert that the date upon which the tendon could have been accessible in surgery before retraction cannot be known. Dr. Duenas's declaration states that Dr. Paik did not call for immediate surgery after the February 2012 initial consultation or the May 2012 evaluation. Dr. Duenas opines that

Smith cannot establish an earlier surgery, such as a surgery prior to Ogbuehi's initial evaluation of Smith in October 2011, would have been successful.

Dr. Baniga first became involved in handling Smith's shoulder problem as a member of the committee that met on January 11, 2012. Smith has not identified an act or omission by Dr. Baniga on or after January 11, 2012, that caused a delay in the surgery performed on August 1, 2012. The committee recommended an evaluation by an orthopedic surgeon and, thereafter, Dr. Paik treated Smith's shoulder. We have located nothing in the record that Dr. Baniga did that impeded Dr. Paik's treatment or otherwise delayed the surgery on Smith's shoulder. Consequently, the trial court did not abuse its discretion when it determined Smith's malpractice claim against Dr. Baniga for delayed treatment of his shoulder lacked sufficient merit to be regarded as bona fide.

With respect to Ogbuehi, she was involved in evaluating Smith from October 2011 until she referred him to the clinical case management review committee in December 2011. After the committee recommended evaluation by an orthopedic surgeon, Ogbuehi was involved in processing the recommendation and obtaining approval, which lead to Smith's February 10, 2012 consultation with Dr. Paik. The trial court could reasonably determine it was highly improbable that Smith could prove Ogbuehi's involvement from October 2011 through February 2012 caused delays that resulted in the tendon retracting to the extent that it could not be reattached during the August 2012 surgery.

Consequently, we conclude the trial court did not abuse its discretion when it determined Smith's claim that Ogbuehi's delays caused his shoulder to become unrepairable lacked sufficient merit to be regarded as bona fide.

C.     Knee Condition

Smith's amended complaint does not allege specific acts or omissions involving his knee that constituted malpractice and caused harm. However, the pleading requests damages for unattended medical conditions and an injunction (1) directing Ogbuehi to

immediately summon the assistance of a qualified physician, such as an orthopedic surgeon with a back and *knee* specialty, and (2) directing Dr. Baniga and the committee that authorizes requests for specialist services to immediately approve that summons of a specialist for Smith. Thus, we interpret the amended complaint as implying that delays in treating Smith's knee condition constituted malpractice and caused him damage.

In June 2010, while Smith was at Donovan, he experienced a sudden onset of right knee pain. The medical staff identified a lateral meniscus tear and preliminarily evaluated Smith for surgery. However, no arthroscopic surgery was performed on the meniscus tear in Smith's right knee because his shoulder injury precluded the use of crutches.

Smith contends Ogbuehi would not accept his documents about his knee problem and she took 11 months to call the records office and get his file, which showed the meniscus tear and contained a recommendation from an orthopedic surgeon for surgery. In June 2012, Smith submitted an inmate grievance relating to the treatment of his knee. In July 2012, Smith requested knee surgery and Ogbuehi requested approval, which was denied because Smith had not completed physical therapy. The July 24, 2012 response to Smith's grievance stated: "Your request a follow up on your knee with an MRI report and memos from the Orthopedic Surgeon is denied in that alternative treatment modalities have not been attempted and … currently a treatment plan is in place." From August through October 2012, Smith received 10 physical therapy sessions for his knee. No knee surgery was performed while Smith was at Pleasant Valley or after his transfer to Folsom.

Dr. Duenas's declaration states there are several accepted treatment plans for meniscus tears, and physical therapy to develop the muscles about the knee might be all that is needed. The declaration also states: "Here, physical therapy and exercise appears to have controlled [Smith's] knee issues from 2012 to present. Indeed, as recently as September 21, 2016, [Smith's] knee was further evaluated by medical staff at Folsom,

27.

[his] treatment options were discussed, and plaintiff chose to continue with conservative management (daily exercises)."

Dr. Duenas also states that Ogbuehi timely and appropriately responded to Smith's complaints of knee pain in July 2012 by submitting his surgery request for consideration and, once it was denied, by referring Smith to physical therapy. Dr. Duenas states Dr. Baniga was not involved in handling Smith's knee condition.

Based on the outcome of Smith's physical therapy and the absence of a knee surgery while at Folsom, the trial court could reasonably determine it was unlikely that Smith could prove any delay by Ogbuehi in requesting that Smith's knee be evaluated by a specialist caused Smith an injury. In addition, to the extent that Smith's malpractice claim relating to his knee involves mishandling of pain medication, the trial court could reasonably determine any such malpractice claim was not bona fide for the reasons stated in part II.A. of this opinion.

Consequently, we conclude the trial court did not abuse its discretion when it determined Smith's claims relating to the treatment of his knee lacked sufficient merit to be regarded as bona fide.

D.      Back Condition

Like the allegations about Smith's knee condition, the amended complaint's allegations relating to Smith's back condition do not describe the specific acts or omissions by Dr. Baniga or Ogbuehi that constituted malpractice or caused him damage. Nonetheless, because the allegations identify Smith's back as one of the sources of his pain, his allegation about mishandled pain medications implicate the treatment of his back. Also, Smith's general allegations about delayed examinations and treatment and the failure to provide access to a specialist can be interpreted as referring to his back condition. This interpretation is supported by the prayer for relief, which requests

damages for unattended medical conditions and an injunction directing defendants to summon an orthopedic surgeon with a *back* and knee specialty.

Smith's back problems predate his transfer to Pleasant Valley. In 2010, UCSD medical staff evaluated him for a back injury, diagnosed him with multilevel degenerative disc disease, and identified an L3 age-indeterminate superior vertebral endplate fracture. The medical staff concluded Smith's spine was stable, he was neurologically intact, and no acute neurosurgical intervention was necessary. For the remainder of his time at Donovan, Smith prioritized treatment of his shoulder condition over treatment of his back condition.

In October 2011, Smith completed an initial pain assessment form at Pleasant Valley. The sources of pain identified by Smith included his lower back. In a meeting with Smith a week later, Ogbuehi evaluated him and completed a chronic pain intake sheet that listed pain in his lower back and mainly in his left shoulder. In February 2012, Ogbuehi completed a comprehensive accommodation chrono for Smith that specified his medical condition required a ground floor cell, a bottom bunk, a knee/back brace, a cane, an extra mattress and physical limitations on his job assignment included no lifting over five pounds, no prolonged standing or stooping, and no frequent bending.

In a June 2012 meeting with Ogbuehi, Smith complained of increased back pain. Ogbuehi examined Smith and had him perform a straight leg test, which Smith contends was not performed properly. Ogbuehi continued Smith's morphine prescription and discussed back exercises.

In a September 2012 meeting with Ogbuehi, Smith complained of neck pain lasting three weeks and not attributable to trauma. Ogbuehi examined Smith, noted decreased range of motion in the cervical spine, and ordered an x-ray. Six days later, the x-ray was taken and showed C6-7 narrowing, generalized arthritis, and spondylosis. In October 2012, Smith and Ogbuehi met again and she noted his neck pain only appeared

29.

with certain head movements and noted spine tenderness. They discussed range of motion exercises.

In November 2012, Ogbuehi evaluated Smith, noted back pain that radiated to his right leg, continued his morphine prescription, prescribed methocarbamol (Robaxin) and ordered an x-ray of his lumbar spine. The x-ray, consistent with the diagnosis of the UCSD medical staff, reflected L2-3 degenerative disc disease, spondylosis, and a chronic L3 vertebral wedge fracture. In December 2012, Smith met with Ogbuehi for a chronic care follow-up visit in which she noted his lower back pain that radiated to his right leg and groin, decreased range of motion, and a negative straight leg test. Smith contends the straight leg test was not performed correctly. Ogbuehi continued Smith's morphine prescription and also recommended oxcarbazepine, which Smith refused. (See pt. II.A.6., *ante* [Oxcarbazepine].)

In January 2013, Smith met with Ogbuehi for a chronic care follow-up visit that addressed Smith's back. The record of the visit reflects that Smith refused every other pain reliever except morphine and stated that physical therapy was not helping. Ogbuehi referred Smith to the clinical case management review committee. In February 2013, Smith met with the committee, which was chaired by Dr. Baniga. The record reflects that Smith wanted to prioritize the treatment of his back and the committee recommended he continue with the same morphine dosage until a full evaluation of his back was completed. Ogbuehi and Smith had further meetings in 2013. In September 2013, after two physical therapy sessions on his back, Smith reported increased back pain and Ogbuehi added a morning dose of morphine for the duration of Smith's physical therapy. For the rest of September, October and November of 2013, Smith received additional physical therapy for his back. In December 2013, Smith met with Ogbuehi for a primary care evaluation and Smith requested to see a back surgeon for his lower back pain. After performing an evaluation and speaking with Smith's physical therapist, Ogbuehi

concluded that the request for an MRI or neurosurgeon evaluation was not medically indicated. Later that December, Smith was transferred to Folsom.

In August 2014, Smith underwent a CT scan of his lumbar spine, which reflected degenerative changes and an age-indeterminate L3 superior endplate compression deformity. In July 2015, an x-ray was taken of Smith cervical spine and it reflected mild cervical arthrosis. In November 2015, Smith underwent an MRI of his lumbar spine. In March 2016, Smith met with Dr. H. Tung for a neurosurgery consultation. Dr. Tung noted Smith would be considered a candidate for surgery, which would include a lumbar decompression. In April 2016, Smith met with Dr. F. K. Gregorius for a second neurosurgery consultation. Dr. Gregorius disagreed with Dr. Tung's evaluation as to fusion and believed Smith was a candidate for a decompressive operation, but that would not have any effect on Smith's back pain. Dr. Gregorius recommended physical therapy twice a week for six weeks. In August 2016, Smith met with medical staff for a follow up evaluation and stated his preference to continue with conservative care for his back and hold off on surgery for as long as possible.

To the extent that Smith's malpractice claim relating to his back involves mishandling of pain medication, we conclude for the reasons stated in part II.A. of this opinion that the trial court did not abuse its discretion in determining that claim was not bona fide. To the extent that Smith claims Dr. Baniga or Ogbuehi negligently failed to refer him to a back surgeon, that claim lacks merit because no surgery was subsequently prescribed and performed after Smith was evaluated by specialists. Thus, any delay in the referral to a specialist did not injure Smith by delaying an operation. Consequently, the trial court could reasonably conclude Smith's failure-to-refer claim also lacks sufficient merit to be regarded as bona fide.

31.

E.       Removal from Ogbuehi's Care

Smith's amended complaint alleges that he made several requests to Dr. Baniga to be assigned to another doctor or nurse practitioner, but the requests were denied.  Based on our earlier determinations about the claims asserted against Ogbuehi, we also conclude that the refusal to remove Smith from Ogbuehi's care was not a bona fide claim.

In summary, the trial court did not abuse its discretion when it denied Smith's motion for appointment of counsel or appointment of an expert on the ground his claims were not bona fide.

## DISPOSITION

The judgment is affirmed.  The parties shall bear their own costs on appeal.


FRANSON, Acting P. J.

WE CONCUR:


PEÑA, J.


DE SANTOS, J.

32.